SIXTH DIVISION
August 24, 2007

No. 1-05-2039

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 90 CR 11985 |
| v. | ) | |
| | ) | |
| TONY ANDERSON, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Defendant, Tony Anderson, appeals from the summary dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2002)). He contends that the circuit court erred in summarily dismissing his petition where he set forth the gist of meritorious claims of (1) ineffective assistance of counsel based upon counsel's failure to investigate defendant's claims of "corruption and coercion" in the conducting of defendant's lineups at Area 2 and (2) that the State violated his right to due process by failing to disclose the existence of voluminous claims of Area 2 police torture pursuant to Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

## I. BACKGROUND

Defendant was indicted on over 100 charges in thirteen different cases in Cook County,

1

stemming from offenses he committed in March and April 1990. Case No. 90 CR 11984 was tried to a judge; case No. 90 CR 11985 was tried to a jury; and defendant pleaded guilty to charges in 11 remaining cases. Case Nos. 90 CR 11984 and 90 CR 11985 arose from two separate robberies of Trak Auto stores both committed on April 15, 1990, the first at 116th Street and Halsted, the second at 73rd Street and Stony Island. In case No. 90 CR 11985, the subject of this appeal, defendant was convicted of armed robbery and sentenced to 25 years' imprisonment.

Prior to defendant's jury trial in case No. 90 CR 11985, defense counsel, William Heenan, filed a motion to suppress three lineup identifications of defendant, contending that they were improperly suggestive and a product of police misconduct.[1]

At the June 5, 1991, hearing on that motion, defendant first called Detective Guy Habiak. Detective Habiak testified that on April 19, 1990, four days after the robbery of the Trak Auto store at 73rd Street and Stony Island, he conducted three separate lineups at Area 2 Violent Crimes located at 111th Street, Chicago. According to Detective Habiak, the first lineup was viewed by James Hill at approximately 11:45 a.m., the second was viewed by Willie Bradley at about 2:15 p.m., and the third was viewed by Linda Hinkle at about 6 p.m.

Detective Habiak testified that the same six men participated in all three lineups.    On

---

[1]Defense counsel also moved to suppress defendant's numerous inculpatory statements, made on the night of his arrest on April 18 and 19, 1990, alleging that they were the product of police coercion. After a hearing on that motion, the trial court found that defendant's confessions were not coerced. We note, however, that in the present case no inculpatory statements were made by defendant with regard to the Halsted store robbery, and none were used at his trial.

each occasion, Detective Habiak placed the six participants in the lineup room and instructed them "to stand in any position they wanted in the lineup." According to Detective Habiak, in the Hill lineup, defendant stood in the number one position, and in the Hinkle and Bradley lineups, he stood in the number six position. According to Detective Habiak, in the Hinkle lineup each participant was also brought forward to a one-way mirror to be viewed by Hinkle, who stood on the other side of that mirror.

Detective Habiak also testified that he had initially contacted Hill and Hinkle by telephone and requested that they come to the station to view the lineups, to see if they could recognize anybody that "might have been in the Trak Auto Store" on the afternoon of the robbery. Detective Habiak denied having told either Hill or Hinkle that there was an offender in custody. He also denied discussing any descriptions of the offender prior to the lineups or instructing either Hill or Hinkle who to pick from the lineup.

Detective McGuire testified that on April 19, 1990, together with Detective Habiak, he conducted three separate lineups at Area 2 headquarters for Hill, Bradley and Hinkle. Detective Habiak admitted that he was in the room with Hill when Hill identified defendant, but averred that he, at no point in time, discussed the lineups with any of the witnesses. Detective McGuire also stated that prior to the lineups he never told Hill, Bradley or Hinkle that he had an offender in custody.

Defendant next called Hill to the stand. Hill testified that on April 19, 1990, he received a telephone call requesting that he come to the police station to view a lineup. Hill stated that he drove to the Area 2 police station alone. Once there, Hill viewed a lineup comprised of six

3

individuals and from that lineup identified defendant as the perpetrator of the robbery at the Stony Island Trak Auto store. Hill averred that prior to the lineup, he had no conversation with anyone at the police station concerning defendant or the lineup procedure. Hill further stated that although Detective McGuire stood next to him in the room while he viewed the lineup, the detective did not speak. Hill also testified that even though he could see Detective Habiak through the one-way mirror standing in the room with the lineup participants, the detective did nothing to make him select defendant from the group.

Bradley next testified that on April 19, 1990, he was working at the Trak Auto store when he received a telephone call from a police officer requesting his presence at a lineup. Soon thereafter, the store manager, Hill, drove Bradley to the police station. Bradley stated that even though he was aware that Hill had viewed a lineup earlier that day, during the ride to the police station, the two of them did not discuss the lineup or any descriptions of the offender. Bradley further testified that once at Area 2 headquarters he viewed a lineup and identified defendant as the perpetrator of the robbery at the Trak Auto store. Bradley testified that the lineup was comprised of six individuals, who were instructed to stand up, turn left and then right. Bradley also stated that he did not discuss the lineup with any of the officers and that he was never told that the police had an offender in custody.

Hinkle next testified that when she arrived to work on April 19, 1990, Hill, her store manager, told her that the police "wanted [her] to look at a lineup about the robbery." Hinkle stated that Detectives Habiak and McGuire then picked her up from the store and drove her to the Area 2 police station. According to Hinkle, the detectives did not tell her that they had an

4

offender in custody, and she did not describe the offender to them. Hinkle further testified that once at the police station, she viewed the lineup and identified defendant as the perpetrator of the robbery. According to Hinkle, although Detective McGuire remained in the viewing room with her during the lineup, he did not speak to her. Finally, Hinkle testified that before she went to the station, neither Hill nor Bradley talked to her about the lineups they had viewed earlier that day.

The State also introduced two photographs of the lineup participants and defense counsel asked that these be admitted as exhibits.[2] In closing, defense counsel argued that the composition of the lineups was unfair because the difference in the individuals' "height, weight, age, and clothing" was "extreme." Counsel also argued that the identifications were tainted because there was ample opportunity for Hill to discuss the lineup he had viewed in the morning with Hinkle and Bradley, who viewed the same lineups later that day. Counsel also asked the court to consider the "circumstances of the police activity in gathering these witnesses to view the lineup[s], in [*sic*] informing them of their police requests or desires to have them view the lineup[s]." Particularly, counsel noted that the two officers picked up and drove Hinkle to the police station, giving them ample opportunity to discuss the lineup in advance and taint her identification.

At the close of this hearing, the court denied defendant's motion to suppress the lineup. In doing so, the court noted:

> "I have had an opportunity to listen and hear the witnesses. I have also had the opportunity to look at the two photographs, which have been presented,

---

[2]We note that these photographs are not part of the record on appeal.

5

indicating the line-ups [*sic*] viewed by the individuals. And I would note the following: Three of the people in the line-up [*sic*] have gym shoes on, three don't. There can't be more than an [*sic*] three-inch spread on the height of any of these individuals. They are all approximately the same height. There is no question that there are some individuals who are slightly taller than Mr. Anderson [defendant]. I think there is one who looks like he could be within a sixteenth of an inch of the height and another one who is very close to the height. A couple might be slightly taller.

I don't know that you can set a fairer composition of the individuals standing in this line-up [*sic*]. There is absolutely no indication that any of these three individuals who viewed these there separate line-ups [*sic*] were led by anyone to identify anyone. As a matter of fact, quite the contrary. Respectfully, the motion to suppress the identification will be denied."

On June 5, and June 6, 1991, defendant proceeded with a jury trial for armed robbery. The evidence presented at trial established that on April 15, 1990, Hill was working as the manager of the Trak Auto store at 73rd Street and Stony Island, together with Bradley and Hinkle, who were operating the cash registers at the front of the store. According to Hill, around 3:30 p.m., at Bradley's request, he went to the front of the store to place change in the cash registers. Hill stated that just as he placed his key into the change drawer, a man approached him from the rear and announced a "stick-up." Hill made an in-court identification of defendant as the man who approached him on that day.

Hill also testified that initially he thought that the "stick-up" was a joke, but then noticed a taller man with a gun, standing behind Hinkle. This man was wearing a black jacket and a black cap. The gunman walked over to Bradley and put the gun to Bradley's back, while defendant took money from the change drawer and Bradley's register and put it in a Trak Auto bag. Defendant then ordered Hill to open Hinkle's register, and after Hill obliged, he took money from both the register and the cash box beneath it and placed it in the same Trak Auto bag.

Hill further testified that defendant ordered the others to stay next to the registers but pushed Hill to move toward the office in the back. Defendant forced Hill to open the office safe, then took the money from the safe, and put it in the Trak Auto bag. Although Hill feared that the gunman was going to shoot him, both defendant and the gunman then "just walked out the door."

Hill also testified about the lineup conducted on April 19, 1990, at Area 2 headquarters where he identified defendant as one of the men who participated in the robbery. Hill's trial testimony regarding the lineup was substantially the same as his testimony at the suppression hearing. In addition, Hill stated that on the day of the robbery defendant was not further than "six, seven, eight inches away" from him and that there was nothing obstructing his view of defendant's face. During trial, Hill also identified the gun and the black jacket worn by the taller man during the robbery.

On cross-examination, Hill indicated that the robbers were not in the store for more than five to six minutes. He also stated that he could not recall if on April 15, 1990, immediately after the robbery, he gave the police officers a description of the robbers' age, height, weight, facial hair, scars or complexion.

Bradley next testified to substantially the same sequence of events as Hill. Bradley identified defendant in-court as one of the robbers and stated that when defendant first announced the "stick-up," he stood 18 inches away from him. Bradley added that during the robbery, defendant threatened Hinkle with "[P]ut your head down or I'll kill you" and Hill with "[G]et the rest of the money or I'll kill you." Bradley also added that after defendant pushed Hill into the office, he ordered Bradley to move everyone to the back of the store, and Bradley obliged. At that point, Bradley escorted the customers to the back exit door and told a fellow employee at the parts counter to call the police to report a robbery in progress. Bradley returned to the front of the store, where he saw Hill in the office with the robbers. Bradley stated that defendant was with a taller man, who wore a black leather jacket and a baseball hat and carried a gun. Bradley then heard defendant threaten Hill with "[O]pen the safe or I kill you [*sic*]," and after that saw defendant and the gunman leave the store with a bag of money.

Bradley also testified to the April 19, 1990, lineup. His testimony was substantially the same as the testimony he gave at the suppression hearing. Bradley also identified the gun that the taller man was carrying and the leather jacket that he wore.

On cross-examination, Bradley stated that when he spoke to police immediately after the robbery, he gave them a description of both offenders. He described defendant as being a black male about 5 feet 8 inches, weighing around 160 pounds, with fairer skin, facial hair on his chin, and no noticeable scars, wearing an unzipped white jacket and shirt. Bradley had described the gunman as a black man about 6 feet 1 inch tall, weighing about170 pounds, of a darker complexion, with facial hair around the upper lip and on the side of his chin, with no scars, and

8

wearing a black cap.

Hinkle testified that on April 15, 1990, she was working at the cash register at the Trak Auto at 7352 South Stony Island. She stated that about 5 p.m. she looked up and noticed that Hill, defendant and a taller man in a dark baseball cap and a dark jacket were standing at Bradley's register and that the taller man held a gun to Bradley's ribs. Hinkle further testified that when the two men noticed that she was looking at them, the taller pointed the gun at her and said, "B–tch, put your head down now or I will blow your f----ng head off." Hinkle immediately obliged, but she stated that she could hear that Bradley's change drawer opened.

According to Hinkle, the gunman then came over to her register, grabbed her by the back of her smock, pushed her backwards, and held the gun to the back of her head. The two men then commanded Hill to open Hinkle's register and put the money in a Trak Auto bag. According to Hinkle, defendant then ordered everyone except Hill to leave the front of the store. Hinkle complied and left the store.

Hinkle also testified about the April 19, 1990, lineup. Her testimony was substantially the same as her testimony at the suppression hearing.

Detective Sellers next testified regarding the circumstances of defendant's arrest. He stated that about 5 p.m. on April 18, 1990, he was working with his partner, Detective Brosnan, when he noticed a late model Oldsmobile turn onto Aberdeen Avenue at a high rate of speed and then park at Aberdeen and 51st Street in front of a liquor store. Detective Sellers testified that after he obtained the vehicle's license plate number, he discovered that the vehicle had been reported stolen. Detective Sellers then observed three men exiting the liquor store and entering

the parked vehicle. The officers exited their squad car and identified themselves to the occupants of the Oldsmobile. At trial, Detective Sellers identified defendant as the driver of the vehicle. Detective Sellers testified he then observed Detective Brosnan remove a black jacket from the backseat of the vehicle, from which a loaded, small caliber semiautomatic weapon was recovered. After this, Detective Sellers placed defendant under arrest and took him to Area 2 headquarters.

At trial, defendant presented an alibi defense. Defendant's wife, Ferniece Burkley, testified that on April 15, 1990, defendant was at home and did not leave the apartment until at least 5 p.m. Defendant's sister-in-law, Marlin Burkley, testified that on April 15, 1990, she and her children went to defendant's apartment at 2 p.m., and that defendant, his wife and three children were at home. Marlin Burkley stated that when she arrived at the apartment, defendant was sleeping, and that around 3 p.m., she went into his bedroom to wake him up and borrow $20. Burkley testified that she, Ferniece and the six children remained at the apartment until 5 p.m., when they went to Red Lobster for Easter dinner. Both Ferniece and Marlin Brukley testified that when they returned from Red Lobster with the children somewhere between 10 p.m. and 10:30 p.m., defendant was still sleeping.

In its case in rebuttal, the State called Scott Volk and Ricky Norwood, employees of another Trak Auto store, located at 116th and Halsted, which had also been robbed on April 15, 1990 (and which was the subject of case No. 90 CR 11984). Both Volk and Norwood testified that around 2:45 p.m., on April 15, 1990, they saw defendant, and a taller man, wearing a black leather coat and carrying a gun, at the Halsted store.

At the close of the jury trial, defendant was found guilty of armed robbery and sentenced

to 25 years' imprisonment. Defendant appealed his conviction. The public defender appointed to represent defendant on appeal, however, filed a motion requesting leave to withdraw as appellate counsel pursuant to Anders v. California, 386 U. S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967). On November 12, 1993, we granted the motion of the public defender and affirmed the judgment of the circuit court. See People v. Anderson, 1-91-2070 (November 12, 1993) (unpublished order pursuant to Supreme Court Rule 23).[3]

---

[3]We note that in his statement of facts defendant does not indicate that he appealed his conviction but rather asserts that after trial he filed a postconviction petition in which he challenged the sufficiency of the evidence to convict him. According to defendant, the public defender appointed to represent him in this postconviction petition filed a motion to withdraw pursuant to Pennsylvania v. Finley, 481 U. S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987), and the appellate court affirmed his conviction. Defendant looks to the postconviction petition in this case as his third postconviction petition rather than his second one. The State, on the other hand, points out that defendant appealed his original conviction and therefore considers defendant's current postconviction petition as his second postconviction petition. Based on our review of the record, and our decision in the unpublished order in docket No. 1-91-2070, we agree with the State and find that on review defendant presents us with his second postconviction petition. See People v. Anderson, 1-91-2070 (November 12, 1993) (unpublished order pursuant to Supreme Court Rule 23). While there would be very little difference between our review of a second and a third postconviction petition, our determination that this is defendant's second petition, if anything, works to defendant's advantage.

11

On September 29, 2000, defendant filed a *pro se* postconviction petition challenging the sufficiency of the evidence used to convict him and alleging ineffective assistance of trial counsel for, *inter alia,* counsel's failure to "present a defense case on the suggestive lineup" and to impeach the lineup identification witnesses. On October 11, 2000, the circuit court summarily dismissed defendant's petition. In doing so the court noted:

> "I have read the petition. *** I have reviewed transcripts included in the petition. The things we talked about were handled at trial. I do not find any problem with the trial, with anything raised in the petition. It does not come close to showing incompetence of counsel. *** [Defendant's] case has been affirmed on appeal. I find the post conviction petition patently without merit."

On appeal of that dismissal, appellate counsel filed a motion to withdraw pursuant to Pennsylvania v. Finley, 481 U. S. 551, 95 L. Ed. 2d 539, 107 S. Ct. 1990 (1987), and we affirmed the dismissal. People v. Anderson, 1-00-4068 (April 18, 2002) (unpublished order pursuant to Supreme Court Rule 23)**.**

On April 30, 2005, defendant filed a *pro se* "Petition for Leave to File a Successive Petition for Post Conviction Relief" and attached to that his successive postconviction petition. In the petition for leave to file his successive postconviction petition, defendant contended that he met the statutory requirements of cause and prejudice as required under the recent amendments to the Act (see Public Act 93-493, eff. January 1, 2004 (amending 725 ILCS 5/122-1)). As to cause, defendant asserted that his counsel's ineffectiveness and the State's failure to provide the relevant Brady materials which tended to negate his guilt were the objective factors that impeded

him from raising the constitutional issues that he raises in his current postconviction petition in an earlier petition or proceeding. As to prejudice, defendant argued that had the evidence that he attaches to his successive petition been presented at the petitioner's hearing to suppress the identification and/or at trial, the outcome of the trial would have been different as it would have established his innocence.

In the actual successive postconviction petition, attached to the petition for leave to file the petition, defendant asserted that the lineups used to convict him were suggestive and that both the lineups and the in-court identifications should have been suppressed.

Defendant also contended that his trial counsel was ineffective because he: (1) failed to investigate and present available evidence of police abuse and misconduct used to exert confessions and obtain wrongful convictions, and (2) failed to present evidence that one Leo Hicks was incorrectly identified as defendant's codefendant in case nos. 90 CR 11979, 90 CR 11980, 90 CR 11986, 90 CR 11990 and 90 CR 11991, even though it was later determined that Hicks was on house arrest at the time the offenses were committed.

Defendant next asserted that the State failed to disclose exculpatory evidence in violation of Brady, including evidence: (1) that the detectives whom defendant accused of conducting his suggestive lineup had been accused of misconduct by other defendants and (2) that there were numerous instances of police misconduct at Area 2, indicating a systematic practice of employing coercive tactics to obtain confessions, identifications and convictions.

In addition, defendant contended that his constitutional rights were violated when he was placed in lineups after he exercised his right to remain silent and requested an attorney to

represent him.  Finally, defendant alleged that his appellate counsel, both on direct and postconviction appeal, were ineffective because they failed to raise these issues.  On May 9, 2005, the circuit court dismissed the petition, which defendant now appeals.

## II.  ANALYSIS

### 1.  Ineffective Assistance of Counsel

On appeal, defendant first contends that the trial court erred when it summarily dismissed his petition because he stated the gist of a claim of ineffective assistance of counsel in violation of his sixth and fourteenth amendment rights (U.S. Const., amends. VI, XIV).  Defendant asserts that his trial counsel was ineffective for failing to investigate his allegations that Area 2 violent crimes detectives told witnesses to select him from the lineups.  In support of this contention, defendant asserts in his petition that just two weeks after the lineups in this cause, in a separate robbery investigation also involving defendant, the detectives in question secured a warrant for the arrest of one Leo Hicks, based on the positive identification of witnesses made from an eight-participant lineup.  According to defendant, it soon came to light that Hicks could not have been the perpetrator of this robbery because he had been on home confinement at the relevant time.

In the same context, defendant asserts that had counsel Heenan undertaken a proper investigation, he would have discovered evidence of systematic torture and misconduct at Area 2 used to obtain coerced confessions and wrongful convictions.  In support of this contention, defendant attaches his own affidavit[4] in which he avers that in connection with his arrest in a separate case, bearing case No. 90 CR 11984, where he was tried in a bench trial for the robbery

[4]Defendant's affidavit is attached to the successive postconviction petition as Exhibit 2.

14

of the Halsted Trak Auto store, he told his trial counsel that Detectives McDermott and Maslanka coerced his confession in that case and led to him making "incriminating statements" in many other cases as well. Although defendant concedes that there was no confession or incriminating statement used against him in the cause at bar, he argues that evidence of systematic torture at Area 2 would have supported his claim of a tainted lineup and, if introduced at his motion to suppress that lineup or at trial, could have changed the outcome of those proceedings.

The State contends that defendant's petition was properly dismissed because it was barred by the doctrines of waiver and *res judicata*. We agree. The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2004)) provides a means by which a defendant may challenge his conviction for substantial "violations of federal or state constitutional rights." People v. Tenner, 175 Ill. 2d 372, 377, 677 N.E.2d 859, 862 (1997). At the first stage of postconviction proceedings, the circuit court must determine whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2004); People v. Boclair, 202 Ill. 2d 89, 99, 789 N.E.2d 734, 740 (2002). In order to avoid dismissal at this stage, defendant need only present the gist of a meritorious constitutional claim. People v. Gaultney, 174 Ill. 2d 410, 418, 675 N.E.2d 102, 106 (1996). Defendant need only present a limited amount of detail and all well-pleaded allegations in his petition must be taken as true and liberally construed. People v. Edwards, 197 Ill. 2d 239, 244, 757 N.E.2d 442, 445 (2001). We review the circuit court's summary dismissal *de novo*. People v. Coleman, 183 Ill. 2d 366, 387-88, 701 N.E.2d 1063, 1075 (1998).

Because an action seeking postconviction relief is a collateral proceeding, not an appeal

15

from the underlying judgment, the Act contemplates the filing of only one postconviction petition. People v. Evans, 186 Ill. 2d 83, 89, 708 N.E.2d 1158, 1161 (1999). Consequently, all issues actually decided on direct appeal or in the original postconviction petition are barred by the doctrine of *res judicata*, and all issues that could have been raised in the original proceeding, or original postconviction petition, but were not, are waived. People v. Blair, 215 Ill. 2d 427, 443, 831 N.E.2d 604, 615 (2005). Where *res judicata* and waiver preclude defendant from obtaining relief, such a claim will necessarily be frivolous and patently without merit. Blair, 215 Ill. 2d at 445, 831 N.E.2d at 615.

In the present case, we find that defendant's claim of ineffective assistance of counsel for failing to investigate defendant's claims of "corruption and coercion" at Area 2 in order to show that his lineup identification was "orchestrated" is waived because defendant could have raised it in his original postconviction petition. See Blair, 215 Ill. 2d at 445, 831 N.E.2d at 615; 725 ILCS 5/122-3 (West 2004). Defendant's entire claim of a tainted lineup is predicated on the contention that at the time of his lineup, detectives at Area 2 were coercing confessions, which would in turn then make the propriety of his lineup procedure questionable. However, defendant was aware of the predicate facts involving coerced confessions at the time he filed his original postconviction petition. This fact is apparent from defendant's own affidavit attached as part of his successive postconviction petition, which states that prior to his trial in the cause at bar, he told his counsel that in a separate case Detectives McDermott and Maslanka coerced him into making confessions. Defendant was thus aware of the coercion at the time that it allegedly took place in 1990 and at the time of his trial in 1991. Nevertheless, defendant did not raise allegations of

16

coercion that would support a contention of a tainted lineup either on direct appeal or in his original postconviction petition. Instead, defendant waited 14 years, until April 2005, to raise it in his second postconviction petition in the context of counsel's failure to investigate the general coercive tactics used at Area 2 to show that his lineup was tainted. As we find that defendant could have raised this claim earlier, in his direct appeal following trial or in his first postconviction petition in 2000, his failure to do so constitutes waiver of this claim and properly warrants summary dismissal of his postconviction petition. See Blair, 215 Ill. 2d at 445, 831 N.E.2d at 615; 725 ILCS 5/122-3 (West 2004).

Defendant nevertheless contends that his petition is not procedurally barred because the sources relied on by him now constitute "newly discovered evidence," which corroborate his claim that counsel was ineffective for not investigating his allegations of "coercive and corrupt" lineups. In support of his contention defendant attaches numerous documents, which he organizes into 22 exhibits.[5]

For the reasons that follow, we find defendant's contention without merit. We first note that in the context of a successive postconviction petition, the rule of waiver is not merely a principle of judicial administration, but, rather, an express requirement of the statute. See People v. Pitsonbarger, 205 Ill. 2d 444, 458, 793 N.E.2d 609, 620-21 (2002); 725 ILCS 5/122-3 (West 2002)) ("[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived"); People v. Smith, 341 Ill. App. 3d 530, 539, 794 N.E.2d 367, 377

---

[5]The exhibits are marked from Exhibit 1 to Exhibit 4 followed by Exhibits B through Exhibit Q, and will be discussed in greater detail below.

(2003) (because there is less interest in providing a forum for the vindication of defendant's constitutional rights in a successive proceeding, "waiver, which would be a procedural affirmative defense for purposes of the first petition, becomes a substantive consideration going to the merits of a successive postconviction petition"). As such, waiver is generally fatal to a successive postconviction petition, like the one before us today. However, our supreme court has held that the statutory bar to a successive postconviction petition may be relaxed where "fundamental fairness so requires." People v. Morgan, 212 Ill. 2d 148, 153, 817 N.E.2d 524, 527 (2004). In Pitsonbarger, our supreme court made it clear that the sole "analytical tool" that is to be used to determine whether fundamental fairness requires an exception to the statutory procedural bar of waiver or *res judicata* to a successive postconviction petition is the cause-and-prejudice test. Pitsonbarger, 205 Ill. 2d at 459, 793 N.E.2d at 621. The cause-and-prejudice test as enunciated in Pitsonbarger has subsequently been codified in section 122-1(f) of the Act, which became effective on January 1, 2004. That section states:

"Only one petition may be filed by a petitioner under this Article without leave of the court. Leave of court may be granted only if a petitioner demonstrated cause for his or her failure to bring the claim in his or her initial post[]conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial postconviction proceedings; and (2) a petitioner shows prejudice by demonstrating that the claim not raised during his or her initial post[]conviction proceedings so infected the trial that the resulting conviction or sentence

18

violated due process." 725 ILCS 5/122-1(f) (West 2004).

We find that in the present case defendant has failed to satisfy the "cause" prong of the test, so as to be granted leave to proceed with his successive postconviction petition, because he has failed to point to an objective factor that impeded him from raising this claim in an earlier proceeding. In his brief, defendant attempts to circumvent the cause prong by simply stating that "objective factors impeded the prior raising of the issues advanced in the instant petition; specifically *** the emergence of new evidence, the failure of counsel to investigate, and *** the State's failure to surrender exculpatory evidence pursuant to Brady v. Maryland." However, we find defendant's conclusory statement provides no plausible "cause" for his failure to raise his claim of ineffective assistance of counsel for failure to investigate allegations of "corruption and coercion" at Area 2 earlier, because evidence of systematic torture was widely available in 2000 when he filed his first postconviction petition. See People v. Mahaffey, 194 Ill. 2d 154, 185, 742 N.E.2d 251, 268 (2000), citing People v. Franklin, 167 Ill. 2d 1, 15, 656 N.E.2d 750, 758 (1995). In fact, most of the cases that defendant cites to in his postconviction petition were decided between 1987 and 2000. See, e.g., People v. Wilson, 116 Ill. 2d 29, 506 N.E.2d 571 (1987); People v. Banks, 192 Ill. App. 3d 986, 549 N.E.2d 766 (1989); Wilson v. City of Chicago, 6 F.3d 1233 (7th Cir. 1993); United States ex rel. Maxwell v. Gilmore, 37 F. Supp. 2d 1078 (N.D. Ill. 1999). Similarly, the Report of the Chicago Police Department's Office of Professional Standards (OPS) report[6] to which defendant cites in his current petition, and which he attaches as Exhibit B,

---

[6]The OPS investigation began in 1989, following internal investigation of police misconduct at Area 2. "The first section of the OPS report is known as the Goldston report. It

19

Exhibit 3, as well as portions of Exhibit G,[7] was completed on September 28, 1990, ten years before defendant filed his original postconviction petition. See Orange, 195 Ill. 2d at 445, 749

---

documents the allegations of 50 different suspects concerning misconduct by Area 2 personnel from 1973 to 1986. The allegations included 27 incidents of beatings, 13 incidents where a plastic bag or typewriter cover was placed over a suspect's head, 11 incidents where a firearm was used to threaten or strike a suspect, 9 incidents of electroshock, and 2 hanging incidents. The report concluded that Area 2 police, [headed by commanding officer Jon Burge], engaged in systematic abuse of suspects during the 13-year period, which included planned torture." People v. Orange, 195 Ill. 2d 437, 445-46, 749 N.E.2d 932, 937 (2001). The second section of the OPS report is the Sanders report, which is an analysis of the Andrew Wilson case. That report found that "Burge [himself] actively participated in the 'mistreatment' of Wilson, burned Wilson with a radiator, repeatedly shocked him, and 'engaged [him] in several unjustified physical altercations during which Mr. Wilson was handcuffed and incapable of providing any resistance.'" People v. Patterson, 192 Ill. 2d 93, 141, 735 N.E.2d 616, 643 (2000).

[7]Among other things, Exhibit G contains OPS reports detailing allegations against Sergeant John Byrne, made by Gregory Banks and Darrell Cannon. One of the reports in Exhibit G is a one-page document titled "Summary Report–Subject: Complaint Register Investigation No. 188617." The report bears two dates: June 4, 1993, and March 20, 1995, and concerns allegations of misconduct by Gregory Banks against Sergeant John Byrne. Exhibit G also contains a January 31, 1994, OPS report concerning Darrell Cannon's allegations of abuse at the hands of Area 2 police officers.

No. 1-05-2039

N.E.2d at 937.

We similarly find that the majority of the exhibits that defendant attaches to his successive postconviction petition are not "new," as they were in existence at the time he filed his original postconviction petition in 2000. As such, defendant could well have established his current claim of ineffective assistance of counsel for failure to obtain evidence of "coercion and corruption" in the lineup procedures at Area 2, based on the data that was already available to him at that time. All the documents in Exhibit 1, pertaining to the case of Leo Hicks and the armed robbery of the Anjon Beauty Salon (and in which defendant was also charged in case No. 90 CR 11991), are dated 1990 and were therefore available 10 years before defendant filed his first postconviction petition.

Similarly, Exhibit C, a copy of a party's answer to plaintiff's complaint in the case of Wilson v. City of Chicago, No. 86 C 2360 (N. D. Ill., October 3, 1995), is dated June 21, 1995, five years prior to defendant filing his original postconviction petition. Exhibit D, a portion of an untitled legal pleading, signed by the corporation counsel of the City of Chicago and again referencing plaintiff Wilson, is dated May 15, 1995, five years prior to defendant's filing of his first postconviction petition. Exhibit J, a memorandum from the chief administrative officer of the City of Chicago detailing legal bills paid in connection with the Wilson v. City of Chicago case, is dated November 7, 1991, predating defendant's original postconviction petition by nine years.

Two Citizen Alert letters, contained in Exhibit K, both predate the filing of defendant's original postconviction petition. The first is dated July 26, 1989, and asks that OPS open an investigation into allegations of abuse by Jon Burge, and the second is dated August 2, 1999, and

21

asks Chicago police superintendent, Terry G. Hillard, OPS director, Callie Baird, and the president of the Chicago Police Board, Demetrius E. Carney, to reopen and review the OPS investigation.

Similarly, most of the newspaper articles that defendant attaches to his current petition predate the filing of his original postconviction petition. Exhibit L, a Chicago Tribune editorial calling for a full probe of the Darrell Cannon, Aaron Patterson, Ronald Kitchen and Derick King cases, was published on July 31, 1999. Exhibit M, a Chicago Sun-Times commentary, arguing that Aaron Patterson's allegations of abuse at the hands of Jon Burge reinforce the newspaper's previous call for a moratorium on executions in Illinois is dated December 15, 1998. Exhibit E is a one-page transcript of a "60 Minutes II" segment, which aired on television on December 7, 1999, approximately 10 months prior to defendant's filing his original postconviction petition. Similarly, Exhibit Q contains three Chicago Tribune newspaper articles that are all dated 1999.[8]

Exhibit N also contains documents predating the filing of defendant's original postconviction petition by more than 10 years. That exhibit is comprised of a series of letters to

---

[8]The first article reports that the then State's Attorney Richard Devine asked the Illinois Supreme Court to temporarily halt proceedings in three death penalty cases–Aaron Patterson, Ronald Kitchen and Derick King–because proceedings in Darrell Cannon's case could resolve the question of whether there was systematic coercion at Area 2. The second article reports that Patterson's supporters met with State's Attorney Devine to make their case for a new hearing. The third article is an editorial, arguing that "[N]ow is the time to determine whether there was a pattern of brutality by police or others that put innocent people on Death Row."

Flint Taylor, one of Patterson's attorneys, concerning the Andrew Wilson case, which are postmarked March 6, 1989, March 15, 1989, and June 16, 1989.

In the same vein, Exhibit Q contains a series of correspondence regarding the injuries sustained by Andrew Wilson, which was in existence 18 years before defendant filed his original postconviction petition. This correspondence includes a February 17, 1982, letter from Dr. Raba to the then superintendent of police, Richard Brzeczek, detailing Wilson's injuries, followed by a February 28, 1982, letter from Brzeczek to the then State's Attorney Richard M. Daley, informing Daley that he had received a letter from Dr. Raba indicating that Andrew Wilson "sustained certain injuries subsequent to his arrest" and seeking Daley's direction "as to how the Department should proceed in the investigation of these allegations."

Exhibit Q also contains a letter from Jesse L. Jackson to the then State's Attorney, Richard Devine, requesting a review of the proceedings in Aaron Patterson's case, dated February 23, 1999.

We do recognize, however, that a few of the documents on which defendant relies as newly discovered evidence became available only after he filed his original postconviction petition in 2000. These include: (1) a copy of a party's response to a motion to bar the depositions of Mayor Richard M. Daley and other officials in the case of Patterson v. Burge, No. 03-C-4433 (Cir. Ct. Cook Co.) (Patterson pleading), dated September 24, 2004; (2) copies of two Citizen Alert letters addressed to Richard Devine, requesting the appointment of a special prosecutor to investigate allegations of misconduct by police officers under the command of Jon Burge dated March 29 and April 2, 2001 (Exhibits O and P), and a copy of a letter dated April 4, 2001,

23

written as a response to these requests by the Chief Deputy to the Cook County State's Attorney, encouraging Citizens Alert to come forward with any newly discovered evidence or information they might have as soon as possible (portion of Exhibit Q); and (3) copies of two newspaper articles, the first an April 29, 2002, Chicago Tribune article reporting the appointment of a special prosecutor to investigate allegations that Burge and others tortured suspected criminals (part of Exhibit Q) and the second a February 12, 2001, Sun-Times article in which Officer Peter Dignan denied that Darrell Cannon was tortured into confessing at Area 2 (Exhibit F).[9]

However, even if the unavailability of these three pieces of evidence would prove sufficient to establish cause for defendant's inability to raise the claim of ineffective assistance of counsel for failure to investigate his allegations of "coercion and corruption" in his lineup procedure earlier, defendant cannot establish that he suffered any prejudice in connection with this claim. "'Prejudice' exists where the defendant can show that the claimed constitutional error so infected his trial that the resulting conviction violated due process." People v. Brockman, 363 Ill. App. 3d 679, 689, 843 N.E. 2d 407, 415 (2006). Because the conviction of an innocent person violates the due process clause of the Illinois Constitution, our supreme court has recognized the right of a postconviction petitioner to assert a claim of actual innocence based upon newly

---

[9] We also note that defendant attaches two undated materials: (1) a copy of an undated article cut from an unidentified newspaper, reporting that a former Houston, Texas, sheriff received a 10-year sentence upon his conviction for eliciting confessions via torture (Exhibit H); and (2) a copy of an undated book review of a nonfiction book about the Wilson case, Unspeakable Acts, Ordinary People, by John Conroy (Exhibit I).

24

discovered evidence. See Brockman, 363 Ill. App. 3d at 689, 843 N.E. 2d at 415. To win relief under this theory, however, defendant must show that the evidence he is relying on (1) is of such conclusive character that it will probably change the result on retrial; (2) is material to the issue, not merely cumulative; and (3) was discovered since trial and is of such character that the defendant in the exercise of due diligence could not have discovered it earlier. See Brockman, 363 Ill. App. 3d at 689, 843 N.E. 2d at 416; see also Orange, 195 Ill. 2d at 450-51, 749 N.E.2d at 940, citing People v. Molstad, 101 Ill. 2d 128, 134, 461 N.E.2d 398, 402 (1984).

In light of the overwhelming evidence of defendant's guilt, there is no probability that this evidence would change the result of defendant's proceeding on retrial. The evidence presented at defendant's trial established that three of the store employees identified defendant in court as one of the perpetrators of the armed robbery at the Stony Island Trak Auto store. All three victims testified in great detail regarding the robbery and the threats made to them by defendant. All three witnesses also testified as to the circumstances of their lineup identification of defendant, which occurred only four days after the robbery, and all three indicated that they had made the identifications independently, without coercion, interference or misconduct by the officers involved. Two additional witnesses testified that they had been robbed by defendant in the vicinity of the Stony Island Trak Auto store on the morning of the robbery and identified him in open court. In light of this evidence, there is no reasonable probability that, had generalized evidence of a systematic pattern of torture at Area 2, with no reference to misconduct in lineup identification procedures, been introduced at defendant's trial, the result of the proceeding would have been different.

Moreover, a review of the <u>Patterson</u> pleading, the correspondence between Citizen Alert and Richard Devine, and the newspaper articles reveals that none of them contain any information that would support defendant's allegations that Detectives Habiak and McGuire "orchestrated" his lineup identification. Neither officer is mentioned in any of these documents. Moreover, the allegations of coercion and torture in the <u>Patterson</u> pleading and the articles involve the use of torture techniques, namely, electric shock, to obtain coerced confessions and make no references to misconduct in lineup identification procedures. In this context, we further note that in respect to the <u>Patterson</u> pleading, self-serving documents prepared in anticipation of litigation "generally lack the earmarks of trustworthiness and reliability." <u>People v. Smith</u>, 141 Ill. 2d 40, 73, 565 N.E.2d 900, 914 (1990). Moreover, with respect to each of these documents, at best, each would provide cumulative corroboration of the previous evidence of Area 2 coercive tactics and is, therefore, not "new." See <u>Orange</u>, 195 Ill. 2d 450-51, 749 N.E.2d at 940.

More overridingly, because generalized claims of abuse, without any link to defendant's case, *i.e.,* some evidence corroborating defendant's allegations that he was coerced into making a confession, or some similarity between the type of abuse alleged by defendant and that presented by the evidence of other cases of abuse are insufficient to support a claim of coercion, they are certainly too tenuous or remote to support a claim of a "tainted lineup." See, *e.g.* <u>People v. Maxwell</u>, 173 Ill. 2d 102, 120-21, 670 N.E.2d 679, 687 (1996) (holding that without some evidence that defendant was injured, evidence of the treatment of other suspects, through reports of physical abuse and coercion of confessions at Area 2, could not, by itself, be the basis for a postconviction evidentiary hearing); <u>People v. Hinton</u>, 302 Ill. App. 3d 614, 626, 706 N.E.2d

26

1017, 1022-23 (1998) (Greiman, J., specially concurring) (rejecting defendant's contention that he was entitled to an evidentiary hearing on his postconviction petition because he had new evidence that showed "systematic torture" at Area 2, specifically an affidavit from an Illinois attorney, OPS reports, findings from the Chicago police board, and his own affidavit asserting that he was beaten, pistol-whipped, shocked and suffocated, because defendant did not present sufficient evidence of *his own* injury); People v. Hobley, 159 Ill. 2d 272, 311-12, 637 N.E.2d 992,1009-10 (1994) (holding it was not error for trial court to bar testimony of three witnesses who claimed they had also been abused by the same officer who abused defendant because there was no evidence that the defendant had sustained injuries consistent with his claim of police brutality); People v. Hobley, 182 Ill. 2d 404, 448-49, 696 N.E.2d 313, 335-36 (1998) (Hobley II) (denying postconviction petitioner's request to proceed to an evidentiary hearing, holding that "new evidence" consisting of the OPS report and transcripts of testimony from other alleged victims of abuse did not alter the court's determination that defendant did not suffer injuries consistent with his claims of abuse); People v. Murray, 254 Ill. App. 3d 538, 553, 626 N.E.2d 1140, 1150 (1993) (holding that defendant's allegations of abuse of other suspects were properly excluded because they were "general in nature"); Mahaffey v. Schomig, 294 F.3d 907, 917 (7th Cir. 2002) (noting that defendant's failure to produce any corroborating eyewitness testimony, medical records or supporting evidence dealing with the injuries he alleges he sustained while in custody significantly undermined his involuntary confession claim). All the more, under the reasoning and analysis of the foregoing cases, the fact that these three pieces of evidence may show that officers at Area 2 abused and tortured defendants to coerce their confessions it is

27

insufficient to establish that the officers here perpetrated a different type of misconduct in manipulating witnesses for the purpose of obtaining false lineup identifications, so as to warrant consideration in a successive postconviction petition. This is all the more true here, where there was testimony by three witnesses negating any such interference or manipulation by the police officers involved in the lineup procedure.

We further find that we cannot at this time entertain any consideration of defendant's reliance upon the Report of the Special State's Attorney for evidence of coercion. While the reasons already articulated above would pertain to the Report of the Special State's Attorney, namely that evidence of a pattern of systematic coercive tactics to obtain confessions is too remote to establish coercion in a lineup procedure, we nevertheless should not consider this document at all, at this time, because defendant did not attach it to his successive postconviction petition but introduced it for the first time on appeal. We note that although we initially granted defendant's request to cite to that report as additional authority, we find that it would be ill advised for us to consider that report for the first time on appeal without it first being attached to defendant's postconviction petition for initial scrutiny and evaluation at the trial court level. See 725 ILCS 5/122-2 (West 2002) ("[a postconviction] petition *shall have* attached thereto affidavits, records, or other evidence, *supporting its allegations"* (emphasis added)); People v. Collins, 202 Ill. 2d 59, 66-69, 782 N.E.2d 195, 199-200 (2002) (holding that postconviction petitioner cannot be excused from the *pleading* requirements of section 122-2); People v. Turner, 187 Ill. 2d 406, 414, 719 N.E.2d 725, 730 (1999) (holding that failure to attach the necessary affidavits, records or other evidence or explain its absence is "fatal" to a postconviction petition);

28

Coleman, 183 Ill. 2d at 380, 701 N.E.2d at 1071, quoting People v. Jennings, 411 Ill. 21, 102 N.E.2d 824 (1952) (holding that failure to attach the necessary documentation by itself justifies the petition's summary dismissal); People v. Jefferson, 345 Ill. App. 3d 60, 71, 801 N.E.2d 552, 560 (2003) (holding that, at the first stage of postconviction proceedings, " '[t]he circuit court is required to make an independent assessment *** as to whether *the allegations in the petition,* liberally construed and taken as true, set forth a constitutional claim for relief.' (Emphasis added) [Citation.] Issues that are raised for the first time on appeal are by definition not 'allegations in the petition' "); People v. Montgomery, 327 Ill. App. 3d 180, 186, 763 N.E.2d 369, 375 (2001) (holding that affidavit attached on appeal but not as part of defendant's postconviction petition as required by the Act is stricken because "[a]ppellate review is generally restricted to what has been properly presented and preserved of record in the trial court").[10]  Although the Report of the

_____

[10]In an earlier appeal from a denial of a different postconviction petition filed by the same defendant with respect to another conviction (case No. 90 CR 11984), we did consider, with the apparent acquiescence of both parties, the impact of the Report of the Special State's Attorney, without it first having been filed in the trial court.  See People v. Anderson, No. 1-05-1379 (December 22, 2006) (unpublished order pursuant to Supreme Court Rule 23).  In that decision, we found that under the facts of that case coupled, among other things, with the explicit refusal of the Report of the Special State's Attorney to support defendant's contentions with respect to any of his convictions, that defendant did not sufficiently cross the threshold of cause and prejudice for his petition to proceed to the second stage of postconviction proceedings.  See People v. Anderson, No. 1-05-1379 (December 22, 2006) (unpublished order pursuant to Supreme Court

No. 1-05-2039

Special State's Attorney did not materialize until after the circuit court had already ruled on defendant's postconviction petition,[11] we note that neither by statute nor case law is there any limit to the number of successive postconviction petitions that can be filed with the trial court, so as to enable that court to first consider any allegedly newly discovered evidence before it is submitted for appellate review.

Defendant may well contend that even without considering the Report of the Special State's Attorney, this case is similar to Patterson, 192 Ill. 2d 93, 735 N.E.2d 616, and People v. King, 192 Ill. 2d 189, 735 N.E.2d 569 (2000), cases holding that defendants were entitled to evidentiary hearings based on allegations of newly discovered evidence of police abuse at Area 2. We find these cases inapposite. We first note that both King and Patterson involved newly discovered evidence presented in a *first* postconviction petition, not in a successive postconviction petition. Moreover, in both King and Patterson the defendants sought to establish that their own confessions were coerced based upon evidence showing a pattern of systematic abusive conduct by officers at Area 2 to obtain such confessions. In neither case did the

Rule 23). However, we recognize in this decision that the better practice would have been not to have considered that report in any event for the first time on appeal without it first having been presented to the trial court, for the reasons heretofore indicated.

[11]The Report of the Special State's Attorney was completed pursuant to a court order of the chief judge of the circuit court criminal division entered on April 24, 2002, and released in July 2006, six years after defendant filed his second postconviction petition, and after defendant filed the reply brief in the current cause.

30

defendants try to use evidence of systematic coercion of confessions to establish misconduct in the lineup procedure. In the present case, defendant made no incriminating statements that were used against him at trial. As such, as already discussed above, evidence of misconduct by other officers in coercing confessions from other defendants at Area 2 would be too remote to establish a tainted lineup.

### 2. Brady violations

Defendant next contends that his petition states a gist of a meritorious claim under Brady v. Maryland, 373 U.S. 83, 10 L.Ed.2d 215, 83 S. Ct. 1194 (1963), because the State violated his due process right to a fair trial by failing to disclose exculpatory evidence of voluminous claims of Area 2 police torture "echoing" defendant's claims of coercion. Specifically defendant contends that the State failed to disclose evidence of a pattern of coercion of confessions at Area 2 involving Detectives Habiak and McGurie which would have bolstered his contention that the lineup in his case was tainted and led the trial court to conclude that "the lineup identifications could not be trusted." Defendant further asserts that Assistant State's Attorney Kip Owen knew of this misconduct, but failed to disclose it to the defense.

The same reasons that led us to conclude that defendant's contentions of ineffective assistance of counsel in failing to obtain evidence of a systematic pattern of coerced confessions to establish a tainted lineup were without merit lead us to conclude that defendant's attempt to obtain review by reason that the State failed to disclose this information must likewise fail.

Illinois courts have long recognized that a criminal defendant's right to due process and a fair trial is violated by the prosecution's failure to disclose material evidence favorable to the

31

defense and that such claims are cognizable in postconviction proceedings. People v. Harris, 206 Ill. 2d 1, 44, 794 N.E.2d 314, 341 (2002); People v. Hobley, 182 Ill. 2d at 429-32, 696 N.E.2d at 326-332. To establish a Brady violation, defendant must show that the suppressed evidence was both material and favorable to his defense. Evidence is material if there is a reasonable probability that the result of the defendant's trial would have been different had the prosecution disclosed the evidence. People v. Thomas, 364 Ill. App. 3d 91, 101, 845 N.E.2d 842, 852-53 (2006). "A reasonable probability of a differing result is one *** sufficient to undermine confidence in the trial's actual outcome." Thomas, 364 Ill. App. 3d at 101, 845 N.E.2d at 852-53. Accordingly, to succeed on a claimed Brady violation, a defendant must demonstrate that (1) the undisclosed evidence is favorable to him because it is either exculpatory or impeaching, (2) the evidence was either willfully or inadvertently withheld by the State, and (3) withholding the evidence resulted in prejudice to him. People v. Rapp, 343 Ill. App. 3d 414, 418, 797 N.E.2d 738, 741 (2003).

We first note that defendant has waived this claim by failing to raise it in his original postconviction petition. See People v. Pitsonbarger, 205 Ill. 2d 444, 458, 793 N.E.2d 609, 620-21 (2002); 725 ILCS 5/122-3 (West 2002) ("[a]ny claim of substantial denial of constitutional rights not raised in the original or amended petition is waived"); People v. Smith, 341 Ill. App. 3d 530, 539, 794 N.E.2d 367, 377 (2003) (because there is less interest in providing a forum for the vindication of defendant's constitutional rights in a successive proceeding, "waiver, which would be a procedural affirmative defense for purposes of the first petition, becomes a substantive consideration going to the merits of a successive postconviction petition"). As detailed above, the exhibits submitted in support of defendant's claim were discoverable prior to his filing his

original postconviction petition in 2000. Moreover, even assuming that the State did possess such evidence of misconduct at Area 2 at the time of defendant's trial, and that defendant could not have discovered it at the time he filed his original postconviction petition, defendant cannot meet the Brady materiality test because, as discussed above, there is no reasonable probability that, had such evidence of systematic torture at Area 2 been disclosed to the defense, the result of the proceeding would have been different.

## CONCLUSION

For the foregoing reasons, we find that defendant's postconviction petition was properly dismissed for failing to state any meritorious claims. Accordingly, we affirm the order of the circuit court of Cook County.

Affirmed.

FITZGERALD SMITH, P.J., and McNULTY, J., concur.