2022 IL App (1st) 201343-U

THIRD DIVISION
November 9, 2022

No. 1-20-1343

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 19150 |
| | ) | |
| JEROME ADAMS, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Gordon and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the trial court's denial of leave to file a successive postconviction petition where defendant's claims were barred by *res judicata* and waiver and otherwise lacked merit.

¶ 2    Following a bench trial, defendant, Jerome Adams, was convicted of attempted first-degree murder and sentenced to 10 years' imprisonment, plus a mandatory 25-year add on for personally discharging a firearm during the commission of the offense. This appeal arises from

the denial of defendant's motions for leave to file a successive postconviction petition and for substitution of judge.

¶ 3    The record shows that defendant was charged by indictment with five counts of attempted first-degree murder and one count of aggravated battery.

¶ 4    The evidence at trial established that on September 7, 2012, defendant was living at a home on South Spaulding Street in Chicago with his girlfriend, Carolyn Webster, and her five children. The victim, 17-year-old Michael Gray, was a friend of one of Webster's sons and also lived at the home. At the time of the offense, Webster was five months pregnant with defendant's child, and, at the time of her trial testimony, Webster had given birth to their child.

¶ 5    Webster testified at trial that in the late evening and early morning hours of September 6 and 7, 2012, several people were at the house drinking on the front porch. At some point, defendant took Webster's drink and threw it across the street. Webster testified that she was "mad" so she ran into the house and grabbed a burner grate from her stove. Defendant followed Webster inside and, in front of the victim, Webster hit defendant on his shoulder with the burner grate once or twice. Defendant then took the burner grate from Webster, pushed her down, and hit her in her face twice. Webster testified that the victim grabbed defendant to stop him from hitting Webster, and then defendant left, walking out the back door of the house.

¶ 6    Webster testified that she sat on her couch while the victim stood by the stove in the kitchen. Shortly thereafter, defendant came back into the house through the front door. Webster saw defendant talking to the victim, and then the victim and defendant started "tussling." The victim pushed defendant onto the couch. Webster testified at trial that they were fighting over a gun, and she "guess[ed]" that defendant had the gun. Defendant was standing on the couch and they were "tussling over the gun." Webster "tried to tell them stop," and the victim said, "what

are you doing, what are you doing." Defendant then said, "stop, stop, before this gun go[es] off; stop before this gun go[es] off." Webster further testified that defendant asked her to "step back before this gun go[es] off." Webster stepped back, and then heard a shot.

¶ 7    Webster testified that she did not see who fired the shot, but she saw the victim fall to the ground. Prior to the shooting, she saw both defendant and the victim with the gun, but she saw defendant with the gun first. Webster testified that after the gunshot, she did not know where defendant went as she was not paying attention to him at that time.

¶ 8    Webster further testified that the police came to her residence and the victim was taken away in an ambulance. Webster went to a police station and gave a videorecorded statement to an assistant state's attorney (ASA). At trial, Webster acknowledged that in her statement, she told the ASA that when defendant returned to the house, he came in the front door and pointed a gun at the victim. Webster could not recall if she told the ASA that defendant said to the victim, "you want to be in my business, stay out of my business." Webster also acknowledged that during the videorecorded statement, she reenacted the shooting by standing up and playing the role of the victim, while the detective played defendant. The detective stood on a chair because Webster told him that defendant was standing on the couch. Webster also demonstrated that the victim put his hands out in an effort to push away the gun, and that the victim was facing defendant straight on.

¶ 9    During her trial testimony, Webster recanted portions of her videorecorded statement. She testified that at the time of the shooting, and during the videorecorded interview, she was drunk and that the shooting "didn't happen" the way she demonstrated. Webster testified that they were drinking "three half gallons of vodka," gin, and some beers, and that she personally drank about "a bottle and a half." She further stated that she was at the police station for hours

and did not get any sleep. Webster testified that she was angry at defendant because they had just been in a physical altercation.

¶ 10    Webster testified generally that she did not have an independent recollection of the interview. Webster testified that she did not remember if she told the ASA what the victim said right before he was shot. She did not remember telling the ASA that after the shooting, defendant called her a "b***" and walked out the front door. Webster admitted that the ASA asked her if she was under the influence of drugs or alcohol at the time of her statement and she responded that she was not. Webster stated that the victim had stayed with her before, and that his mother had kicked him out of the house for lying and stealing from her. She stated that she cares for the victim and was upset after seeing him shot.

¶ 11    On redirect, Webster testified that she had visited defendant between 10 and 20 times since the shooting and she had not visited the victim.

¶ 12    Shakira Johnson testified that she was 16 years old and Webster's niece. Shakira's mother is Sherita Mullen, and Shakira had a 14-year-old sister named Shamya. Shakira testified that she knew Webster's son Tyberius, and his friend, the victim. On the night of the shooting, Shakira, her mother, and her sister were living with Webster, and Shakira knew defendant because he was dating Webster.

¶ 13    Shakira testified that between midnight and 12:45 a.m., she was outside on the front porch talking on the phone. The victim, defendant, and Webster were also at the residence. Shakira could hear defendant and Webster arguing inside the house at that time. The victim came out on the porch, spoke to Shakira, and then went back inside the house. As Shakira continued to talk on the phone, she eventually walked out to, and sat on, the curb on the street. Shakira then heard a gunshot coming from inside the residence. After the gunshot, Shakira saw defendant

running through an alley behind the house holding a gun. Shakira watched defendant run out of the alley and onto Spaulding Avenue, and then she went into the house. When Shakira walked into the house, she saw Webster crying, and she saw the victim on the floor. Shakira testified that the victim looked at her and said, "help me, help me," and Shakira called the police. Shakira could see that the victim had been shot in the head. Around 3:35 a.m., Shakira spoke with detectives at the police station, with her mother present, and identified a photograph of defendant. Shakira never saw the victim, or anyone other than defendant, with a gun that night.

¶ 14    Shamya Johnson, Shakira's sister, also testified at trial. Shamya testified that she was 14 years old, that Webster is her aunt, and that she knows the victim and defendant. On September 7, 2012, Shamya was staying at the home on South Spaulding with her mom and sister. Just before midnight, Shamya was upstairs sleeping along with her little sister, Sharissa, and her cousins. Shamya's sister Shakira was downstairs. Shamya testified that she heard the victim yell, "don't shoot," and Webster say "no, no, stop," just before a gunshot. Shamya came downstairs, saw Webster crying, and saw the victim on the ground with blood. She further testified that defendant was in the house that night before she went to bed, but he was not there when she came downstairs.

¶ 15    The victim testified that on September 7, 2012, he was at Webster's home, along with defendant, Shakira, Shamya and others. Around midnight, the victim was playing cards with Webster, defendant, and Sherita Mullen. During a card game, Webster and defendant got into an argument and defendant threw Webster's drink on the ground. Defendant and Webster started arguing and defendant threw Webster to the ground.

¶ 16    The victim testified that defendant then walked into the kitchen and grabbed a metal burner from the stove. The victim saw defendant raise his hand to strike Webster with the metal

burner. Defendant hit Webster and the victim "rushed over" and put his hand out to stop him. Defendant then went to the closet and retrieved a pole, which he swung at Webster, and then defendant ran out the back door.

¶ 17    The victim sat on the couch and asked Webster "if she was all right," and Webster replied affirmatively. At that point, defendant walked in the back door with a big black metal gun in his hand. The victim testified that the last thing he remembered was defendant walking toward him with the gun, before he woke up in the hospital and learned he had been shot. The victim testified that he was shot in the skull slightly behind and above his right ear. He learned that he had undergone three surgeries, including removing part of his skull. The victim testified that he had to relearn things after the shooting, including how to walk and talk, and that his memory is "pretty bad."

¶ 18    Tyesha Sanders, Webster's sister, testified that she was at the house the night of the shooting. While she was upstairs that night, she heard "a little argument," and recognized the voices of defendant, Webster and the victim. Sanders heard Webster say "why, Jerome? Why, Jerome?" and defendant say, "stay out of my business." Sanders then heard the victim say "please, man, put that down," and Webster say, "put that down." Sanders also heard Webster say "Why, Jerome? Why did you do that?" During the argument, Sanders heard a gunshot. She ran downstairs and saw Webster crying and drinking. The victim was on the floor with his feet on the couch, and Sanders saw that he had been shot in the head. Sanders identified defendant to police as the person whose voice she heard in the house before the gunshot.

¶ 19    On cross-examination, Sanders acknowledged that she had been drinking for six hours at the time of the shooting. Sanders also acknowledged that she did not initially tell the detective that she heard defendant say "stay out of my business," or that the victim said "please stop."

Sanders also testified that she heard defendant call Webster a "bogus b***." Sanders believed that she heard two gunshots, and acknowledged that she told the detective that she heard three gunshots.

¶ 20    Tomeshah Patterson testified that she was 15 years old at the time of her testimony, and was 13 years old on the night of the shooting. On September 7, 2012, Tomeshah was at the home with defendant, the victim, Webster and others. Around midnight on the night of the shooting, people were drinking and playing cards. Tomesha testified that she was running between the upstairs and downstairs, checking on the younger children and keeping them away from the adults downstairs. At some point, Tomeshah saw defendant and Webster arguing, but she did not pay attention to the argument at that time. Tomeshah went back upstairs and heard more arguing and what she thought was shoving against the wall and "big banging." About ten minutes later, Tomeshah heard a "big boom" which she later learned was a gunshot. Tomeshah raced downstairs and saw the victim on the floor and defendant "running out the back door." From the front window she could see defendant running from the back toward the front of the house onto Spaulding. Tomeshah saw blood coming from the victim's head, and she called the police. On cross-examination, Tomeshah acknowledged that she talked to a detective after the shooting, and that she did not tell the detective that she saw defendant running out the back door or outside from the front window.

¶ 21    Chicago Police Officer Michael Curry testified that he responded to the shooting at approximately 12:44 a.m. on September 7, 2012. When he arrived, he saw the victim bleeding on the floor and made sure the ambulance was on the way. There were four adults and several young children at the home. Officer Curry attempted to secure the scene and determined that the

perpetrator was not present. Thereafter, an ambulance arrived and transported the victim to the hospital.

¶ 22    ASA Kevin DeBoni testified that he interviewed Webster, and that she consented to having her statement video recorded. ASA DeBoni testified that Webster did not appear to be intoxicated, and she told ASA DeBoni that she was not intoxicated when she gave her videorecorded statement. The statement was published in court and admitted into evidence.

¶ 23    The parties stipulated that Dr. Michael Sturgill would testify he was an emergency room doctor at Mount Sinai Hospital and on September 7, 2012, he treated the victim, who was suffering from a gunshot wound to the right hemisphere of the brain. The victim was intubated and taken for surgery. The doctor observed from a CAT scan of the victim's head that there was defused swelling with a bullet in the mid temporal lobe. There was a subarachnoid hemorrhage and subdural hematoma with a fracture of the squamous orbital bone with multiple bone fragments in the anterior temporal lobe. Dr. Sturgill would also testify that blood was taken from the victim, and that the bloodwork showed no alcohol, cannabis, cocaine, or other narcotics in the victim's system. The surgery involved a hemicraniotomy and possible temporal lobotomy as a lifesaving measure. The bullet was removed, but bullet fragments remained in the right hemisphere of the brain. The doctor would further testify that the temporal lobotomy involved removing the skull bone and putting it in a flap in the abdomen, and another surgery removed the skull bone flap and placed it back in the head approximately 22 days later, after the swelling from the injury had gone down. The victim's traumatic brain injury resulted in the victim being unable to sit or turn in bed, dress himself, or attend to personal hygiene. The victim's ability to communicate in both speech and writing was diminished. The victim remained in the hospital from September 7 until November 15, 2012, when he was transferred to Schwab Rehab Institute

where he remained until December 2012. The victim was then transferred to Carbondale Neuro Restorative Rehab where he remained until December 2013.

¶ 24    The parties further stipulated that the victim was treated for a brain injury, and that he suffers from grand mal seizure disorder and a loss of memory.

¶ 25    The State rested, and defendant's motion for directed verdict was denied.

¶ 26    The defense proceeded by stipulation. The parties stipulated that if Detective Steve Soria were called to testify, he would state that he interviewed Shakira with her mother, and Shakira never told the detective that she saw defendant running in the alley behind the house with a gun after the shots or that she heard Webster and defendant arguing before the shooting. Detective Soria would also testify that he interviewed Shamya with her mother, and Shamya never told the detective that she heard Webster say "no, no, stop," while she was upstairs before the gunshot.

¶ 27    The parties also stipulated that Detective Wilbourn would testify that he interviewed Shakira and she never told the detective that she saw defendant running in the alley behind the house with a gun after she heard the shots. He would further testify that Shakira never told the detective that she heard defendant and Webster arguing before the shooting. However, she did tell the detective that she heard them arguing earlier, around 10 or 11 p.m. Detective Wilbourn would also testify that he was present for an electronically recorded interview with Sanders and during that recorded interview, she did not tell the detective or ASA that she heard the victim say defendant's name and "please."

¶ 28    Additionally, the parties stipulated that if called to testify, Assistant Public Defender Randilin Peterson would testify that she interviewed the victim on January 2, 2014. The victim stated that he tried to break up a fight between defendant and Webster and that defendant pulled

out a gun and shot him. The victim did not state that defendant got a pole out of the closet or that defendant left between the fight with Webster and the shooting.

¶ 29    Finally, the parties stipulated that on November 13, 2013, the victim was arrested for misdemeanor battery. The case was dismissed and the Cook County State's Attorney's Office "provided him no benefit in exchange for the dismissal of the case." Following the above stipulations, the court admonished defendant regarding his right to testify, and defendant informed the court that he was choosing not to testify. Defendant indicated that he understood his right, that the decision was his own, and that no one threatened, forced, or promised him anything relating to that decision. The defense rested.

¶ 30    In closing argument, the State argued that the evidence was clear that defendant committed attempted murder, specifically noting evidence that defendant left the home and returned with a gun; that defendant, the victim and Webster made certain statements immediately preceding and following the gunshot; and that defendant fled from the scene. Defense counsel argued that there was not enough evidence to show that defendant intended to kill the victim. Instead, counsel characterized the shooting as a "tragic accident," contending that the gun went off accidentally during a struggle between defendant and the victim.

¶ 31    The trial court took the matter under advisement to review all the evidence.

¶ 32    The next day, the court found defendant guilty on all charges. The trial court found that the most "significant and most important witness in the case" was Webster. It noted that she testified in court "to a set of events that she wasn't sure who had the firearm, that the firearm prior to the shooting had been in the possession of both" defendant and the victim. The court noted, however, that Webster had given a prior videorecorded statement, and that statement was "significantly different than the *** testimony she provided in open court." The court explained:

"I continued the case until today to rule so that I could consider that out-of-court statement that was introduced late yesterday afternoon from Ms. Webster. After reviewing that statement along with all of the other evidence that was introduced, I believe the State has in fact proven [defendant] guilty of the offense of attempt[ed] first degree murder *** and that during the commission of that murder he personally discharged a firearm that proximately caused great bodily harm to [the victim].

                    ***

The basis of that is that I think and believe that the statement that Ms. Webster made the day of this offense was far more credible than her testimony that she gave earlier in January and that I believe that testimony supported proof beyond a reasonable doubt that at the time the defendant fired the gun he intended to kill [the victim]."

¶ 33 The trial court went on to explain that the evidence showed that there had been an argument between defendant and Webster, both of whom were not "particularly innocent here." The court found, however, that the victim attempted to intervene and stop the incident from escalating. At that point, defendant left the apartment and returned, brandishing a firearm and pointing it at the victim. The court noted that even if there was a struggle over the gun, the victim was justified in attempting to prevent himself from being shot. The court additionally pointed to Webster's videorecorded statement in which she indicated that defendant freed his hand which was holding the gun, put the gun to the victim's head, and pulled the trigger. The court additionally noted that defendant did not express remorse after shooting the victim, and he did

not "stay around" or wait for medical personnel. Based on all of the above, the court found that the evidence demonstrated defendant's "intent to kill."

¶ 34    The trial court also specifically found based on its review of the videorecorded statement, that Webster did not appear to be intoxicated at the time she made the statement. The court found the videorecorded statement to be "far more credible than her testimony in open court," in part because the statement was given much closer in time to the relevant events. The court also found that Webster's trial testimony "demonstrated clearly that there was a bias trying to help defendant," specifically noting that she had visited defendant multiple times in the Cook County jail.

¶ 35    Defendant filed a motion to reconsider and a motion for new trial. Defendant argued that his guilt or innocence relied on "whether or not he intentionally shot" the victim, and that the eyewitness testimony of Webster could not be relied upon to establish guilt beyond a reasonable doubt. During argument on the motion, defense counsel stated that the "only difference[s] in her testimony between here in court and the video testimony" was "who pulled the trigger," and whether defendant "was able to get his hand away during the struggle before the gun went off and whether he actually pulled the trigger intentionally." Defense counsel outlined several reasons why the circuit court should not believe Webster's videorecorded statement, including that she was drunk, she was upset regarding what she had witnessed, and she was angry at defendant because of their argument.

¶ 36    The State argued that Webster "had more incentive to be telling the truth on the evening that she gave the" videorecorded statement, than she did "when she comes in here a year and-a-half, two years later," particularly where Webster had since given birth to defendant's child and continued to visit him. The State argued that it was clear from Webster's videorecorded

12

statement that "she was not intoxicated, she was not sleep deprived," and she was not repeating "lines fed to her by somebody else[.]" The prosecutor also noted that other witnesses corroborated Webster's videorecorded statement, and that defendant's flight demonstrated his consciousness of guilt.

¶ 37    The trial court denied the motion for a new trial, finding that the evidence was strong. The trial court noted that it had listened carefully to the testimony of all the witnesses, particularly that of Webster. Specifically, the trial court stated:

> "[I]t was very clear in my mind after listening to [Webster] testify, listening to her being cross-examined, listening to and watching the video more than once, I saw it several times, is that there was one rather credible version of what occurred here, and that was the version that was on the video[.] *** [When] she testified in open court, she was trying to shield [defendant] from what he had done and from what she had observed. Motivation for that apparently was that they had a long-term relationship and she had a child with [defendant], she continued to see him when he was in the Department of Corrections. So the sort of shock, I guess, of what she had seen and realized what [defendant] was capable of had worn off and I guess she was considering her long-term future would be better with [defendant] not convicted of such a serious offense, and so she chose to come into court and give very misleading testimony and testimony that was not credible."

¶ 38    The trial court again summarized that the evidence showed there was an argument between defendant and Webster, and that the victim tried to prevent a physical altercation between them. The court stated that defendant "completely lost his temper" and felt that "violence was necessary to protect his manhood," so he left the apartment, returned with a gun,

13

and aimed it at the victim. The court agreed there was a "struggle," but that the victim was entitled to defend himself, and "at one point in the struggle, *** [defendant] was now again completely in control of the weapon, [and] he fires a bullet from that gun into the young man's head." The court explained:

> "[I]f this was an accident, if this was something other than what it was, why wouldn't you maybe try to stay around and try to help somebody? What's more important, that you not get caught with a gun, you not get arrested or something, or that maybe you try to help somebody that you just put a bullet in their brain unless, you know, that was what you wanted?"

¶ 39    The motion for a new trial was denied and the parties proceeded to sentencing. In aggravation, the State noted in particular the extent of the victim's injuries and requested a sentence of 40 years' imprisonment. The defense requested that the court impose the minimum sentence of 31 years' imprisonment—6 years on the attempted murder conviction, plus a mandatory 25-year add on for personally discharging the firearm—which was a "significant" amount of time. In allocution, defendant stated that he was "willing to take responsibility for [his] actions, *** even though [the shooting] was an accident." Defendant acknowledged that he came back with a gun, and apologized to the victim's family.

¶ 40    The trial court acknowledged that the minimum term of 31 years was "lengthy" and that the trial court had given minimum sentences in other situations where, unlike here, the defendant did not have a criminal background or where the victim had not been shot or suffered injuries. The court concluded that the bare minimum was not appropriate in this case, and that the most appropriate sentence was 35 years' imprisonment—10 years for the attempted murder, plus the mandatory 25-year firearm enhancement.

¶ 41 Defendant filed a timely notice of direct appeal on May 19, 2014. The State Appellate Defender submitted an appellate brief on defendant's behalf in November 2015, arguing that the court erred in its sentencing decision based on a comparison to other offenders who had received statutory minimum sentences. After the State filed its response brief in February 2016, defendant moved to voluntarily dismiss his direct appeal. This court granted his request on February 25, 2016.

¶ 42 Meanwhile, both before and after the resolution of his direct appeal, defendant filed several collateral challenges to his conviction and sentence.

¶ 43 On August 21, 2014, defendant filed a document entitled "Petition for Declaratory Relief," asserting that the statute providing for mandatory sentence enhancements based on the use of a firearm in the commission of an offense (720 ILCS 5/8-4(c)(l)(B), (C), (D) (West 2012)), violated his due process rights and the proportionate penalties clause; was unconstitutionally vague; and constituted an impermissible double enhancement. The circuit court denied his petition on September 30, 2014, finding it frivolous and concluding that the mandatory sentencing enhancement had been routinely held constitutional on all the challenged grounds. Defendant filed a notice of appeal on November 6, 2014, which was denied due to untimeliness.

¶ 44 On October 22, 2014, defendant filed another document entitled "Petition for Declaratory Relief," pursuant to 735 ILCS 5/2-701, raising the same constitutional arguments regarding his 25-year mandatory sentence enhancement. The circuit court denied his petition, and defendant did not appeal.

¶ 45 In February of 2015, defendant filed a petition entitled, "Petition to Quash Complaint & Dismiss Indictment/Relief of Judgement," seeking relief pursuant to section 2-1401 of the Code

of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2014)). Defendant asserted that his indictment was void because the complaint against him was forged and because his indictment was not signed by the foreman of the grand jury in compliance with 725 ILCS 5/111-3 (West 2012). Defendant further asserted that because of these defects, the court lacked both personal and subject matter jurisdiction. On May 29, 2015, the court entered a written order finding defendant's claims to be without factual basis and without merit. The court concluded that defendant failed to show a cause for relief under section 2-1401 of the Code. Defendant did not appeal.

¶ 46   On August 7, 2015, defendant again filed a petition seeking relief from judgment pursuant to section 2-1401 of the Code, (735 ILCS 5/2-1401 (West 2014)), raising identical claims. The circuit court denied his petition on October 9, 2015, finding it frivolous and without merit. Defendant did not appeal.

¶ 47   On January 20, 2016, defendant filed an initial postconviction petition, which he subsequently amended on February 16, 2016. Defendant raised several issues, including, among other things, that his appellate counsel was ineffective for failing to challenge certain issues on appeal, specifically that the complaint was "forged," that the indictment was "based solely on the fraudulent, fatally defective, null and void complaint," and that the trial court "lacked personal jurisdiction over defendant" to bring him to trial. Defendant also maintained that appellate counsel should have challenged the sufficiency of the evidence where the "primary evidence against" him was "Webster's incredible, uncorroborated prior inconsistent statement," and that the firearm enhancement applied to his sentence was an "unlawful double enhancement." Defendant further argued that appellate counsel was ineffective for failing to challenge the admission of Webster's videorecorded testimony as substantive evidence, because it "violated

his *** due process rights" where there was "no ample corroborating evidence of the statement's reliability." Additionally, defendant contended that trial counsel rendered ineffective assistance for failing to move to quash his arrest and the complaint, for failing to object to the introduction of Webster's videorecorded statement, and for failing to argue for a conviction on a lesser offense of reckless conduct. Defendant also contended that trial counsel was ineffective for failing to introduce prior consistent statements that Webster gave to defense counsel's investigator on November 1 and December 6, 2012. Defendant argued that Webster's statements on those dates were consistent with her trial testimony and would have refuted the suggestion that her trial testimony was recently fabricated. Finally, defendant contended that the mandatory firearm enhancement was unconstitutional, as it violated "double jeopardy," was an "unlawful double enhancement," and was not included in his indictment.

¶ 48    In support of defendant's amended petition, defendant attached his own affidavit. Defendant averred that before trial, his counsel informed him that the State had disclosed a copy of a visitor log of visits defendant received while in the Cook County jail showing that Webster "visited [him] a lot." Counsel informed defendant that if Webster "recant[ed] her prior out of court statements at trial," the State would be able to point to the log and argue that her recantation was rehearsed and was at defendant's request. Defendant averred that he asked counsel if "she [was] aware of the prior statements [Webster] made to [defendant's] counsel's investigator on [his] first [two] court dates," and she responded that she was. Defendant asserted that he told counsel that "we can use that to show that [Webster] changed her story a long time ago before all the visits." Defendant did not articulate the substance of Webster's statements or include an affidavit from her.

17

¶ 49 On April 1, 2016, the circuit court summarily dismissed the postconviction petition, finding the issues raised to be frivolous and patently without merit. The same day, the court entered a separate order assessing filing fees and court costs pursuant to 735 ILCS 5/22-105 (West 2016) for frivolous and unnecessary filings.

¶ 50 Defendant filed a notice of appeal, and counsel was appointed to represent him on appeal. On December 14, 2017, appointed counsel filed a motion for leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), based on counsel's assessment that the appeal presented no meritorious issues for review. Counsel submitted a memorandum in support of the motion, in which she expanded on her assessment of the issues raised by defendant. Specifically, counsel noted defendant's claims that trial counsel was ineffective for failing to dismiss his indictment and complaint was not meritorious, in part because his underlying claim that the instruments were "fraudulent and void" was rebutted by the record. As to defendant's argument that counsel was ineffective for failing to object to the introduction of Webster's videorecorded statement, counsel explained that the statement was properly introduced as substantive evidence, and that an objection to its introduction would have been futile. Counsel also addressed defendant's claim that trial counsel was ineffective for failing to introduce Webster's "prior consistent statements." Counsel explained that defendant failed to set forth the content of any such statement or provide any supporting documentation, and without any evidence that Webster actually made a prior consistent statement or what the substance of the statement was, it could not be determined whether any such statement would have been admitted or could have changed the result of defendant's trial.

¶ 51 Counsel further concluded that defendant's arguments regarding the effectiveness of appellate counsel failed as well. Specifically, counsel noted that defendant claimed appellate

counsel was ineffective for failing to argue the sufficiency of the evidence on appeal, based on defendant's claimed that Webster's videorecorded statement was unreliable and uncorroborated. Counsel reiterated that the statement was properly admitted, and that the court, as trier of fact, weighed the credibility of Webster's testimony and her prior statement and ultimately found the prior statement to be more credible. Finally, counsel explained that defendant's argument regarding the constitutionality of the mandatory firearm enhancement statute lacked a cognizable legal basis, as the statute had been upheld repeatedly in the face of the same constitutional challenges.

¶ 52    Defendant was permitted to respond to counsel's motion, and he filed a *pro se* response on January 16, 2018. Defendant acknowledged that several issues in his petition were not meritorious, explaining that he "decided to abandon several of the issues raised in his postconviction petition." Defendant, however, argued that certain arguments were meritorious, and that counsel's assessments of those issues were wrong. Specifically, defendant continued to maintain that trial counsel was ineffective for failing to move to quash his complaint and arrest and to dismiss the indictment. Defendant also argued that trial counsel was ineffective for failing to introduce Webster's prior consistent statements, and to argue for a conviction on a lesser offense of reckless conduct. Defendant further argued that appellate counsel was ineffective for failing to raise an issue as to the sufficiency of the evidence, and to challenge the admission of Webster's videorecorded statement as a violation of defendant's due process rights.

¶ 53    Regarding his claim that trial counsel was ineffective for failing to introduce Webster's prior consistent statements, defendant contended that it was unnecessary for him to describe the contents of Webster's statements, as he had alleged in his petition that they were "consistent with

[her] trial testimony," and he need only "present a limited amount of detail" at the first stage of postconviction proceedings.

¶ 54    On April 12, 2018, this court filed a summary order, granting counsel's motion and affirming the judgment of the circuit court summarily dismissing defendant's postconviction petition. We noted that we had "carefully reviewed the record in this case, counsel's memorandum, and defendant's response and f[ou]nd no issues of arguable merit to be raised in an appeal." *People v. Adams*, No. 1-16-1407 (2018) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 55    Meanwhile, on January 24, 2018, defendant filed another petition pursuant to section 2-1401 of the Code. Defendant again challenged the constitutionality of the firearm sentencing enhancement statute.

¶ 56    On March 28, 2018, the circuit court found that defendant had failed to state a cognizable claim under section 2-1401 and dismissed the petition for relief. The circuit court concluded that defendant had previously raised the same challenges in prior petitions for declaratory judgment and for postconviction relief, and that the law regarding the constitutionality of the mandatory sentencing enhancement had not changed since those petitions. The court found defendant's claims were barred by *res judicata* and were without merit, and dismissed his petition. The court assessed defendant $160 in filing fees and court costs for filing a frivolous petition.

¶ 57    Defendant appealed, and the Office of the State Appellate Defender was appointed to represent him on appeal. Thereafter, appointed counsel filed a motion for leave to withdraw based on counsel's conclusion that the appeal would be without arguable merit. The motion was made pursuant to *Finley* and was accompanied by a memorandum in which counsel concluded that the circuit court correctly determined that defendant's claims were without merit and barred

by *res judicata*. Defendant submitted a *pro se* response restating his argument and claiming that it was meritorious. Defendant further argued that his claims were not barred by *res judicata* because they had not been disposed of on the merits in his prior collateral proceedings, and that he raised grounds that differed from his prior challenges under the proportionate penalties clause and due process.

¶ 58    On March 4, 2020, this court issued a summary order. We explained that we had carefully reviewed the record, counsel's memorandum, and defendant's *pro se* response and found no issues of arguable merit to be asserted on appeal. We therefore granted the motion of the State Appellate Defender for leave to withdraw as counsel and affirmed the judgment of the circuit court of Cook County. *People v. Adams*, No. 1-18-0883 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c))

¶ 59    Meanwhile, on April 4, 2019, defendant filed a combined motion for substitution for judge and motion for leave to file a successive postconviction petition, followed by a combined motion for substitution of judge and petition for relief from judgment in May 2019. On September 20, 2019, defendant filed a "Supplemental Successive Petition for Post-Conviction Relief," and on January 15, 2020, defendant filed an "Addendum In Support of Motion for Leave to File a Successive Petition for Post-Conviction Relief."

¶ 60    Defendant claimed that he was denied the right to a "fair and impartial trial," because the court "abandon[ed] its role as a neutral and impartial arbiter of fact and assum[ed] the role of prosecutor" by "making "conjecture inferences that Webster had a biased interest and motive to testify falsely at trial." Defendant contended that the trial court "solely relied" on these inferences to disbelieve Webster's trial testimony. Defendant also argued that the trial court's statement that it had reviewed the videorecorded statement during an overnight recess indicated

that the court had engaged in improper "private investigation." Defendant alleged that the judge was "biased and prejudiced against" him, and that a "new trial before a different trial judge is warranted."

¶ 61    As grounds for postconviction relief, defendant claimed that trial counsel was ineffective for failing to introduce Webster's prior consistent statements, and for failing to challenge the admission of Webster's videorecorded statement. Defendant also alleged that trial counsel was ineffective for failing to "present the possibility of a conviction for the lesser offense of reckless conduct." Defendant acknowledged that he had previously raised these claims in his initial postconviction petition but asserted that the proceedings on his initial petition were "fundamentally deficient" and that he was denied the opportunity to be heard. Defendant further alleged that postconviction counsel rendered ineffective assistance for failing to argue the claims.

¶ 62    Defendant also argued that trial counsel was ineffective for "incorrectly advising him" to waive his rights to testify and for a jury trial.  Defendant asserted that he told counsel he wanted to testify and have a jury trial, and counsel responded "in a scolding tone" that she strongly opposed his decision to testify and that if defendant testified, "that's all it would take for the State to secure a conviction." Defendant stated that counsel also incorrectly advised him that his criminal background would be brought out only if he chose to testify, when in reality it came out whether or not he testified. Defendant further stated that counsel informed him that if he chose a jury trial, he would "definitely receive the maximum sentence" if convicted, because a jury trial costs the State a significant amount of money and the judge "shows no mercy" to those who choose a jury. Defendant also claimed that his due process rights were violated because his indictment was invalid, arguing it was obtained through the knowing use of perjured, misleading, and unsworn testimony from a detective during grand jury proceedings.

¶ 63    Finally, defendant claimed that the statute underlying his 25-year firearm enhancement is void.

¶ 64    The circuit court entered a written order on November 12, 2020. Initially, regarding defendant's motion for substitution of judge, the court noted that the judge who presided over a defendant's criminal trial generally should hear post-judgment matters unless it is shown that the judge was substantially prejudiced. Although defendant claimed that the judge was prejudiced toward him, and that the judge improperly relied on Webster's bias as the sole reason for rejecting her trial testimony, the record reflected that the judge considered all the evidence, including the substance of Webster's testimony and the conflict between that testimony and her prior statement to police. The court also rejected defendant's claim that the judge conducted improper "private investigation" by considering the videorecorded statement, noting that the statement was introduced into evidence for the judge's review. The court found defendant's claims of bias to be rebutted by the record, and concluded that recusal was not warranted.

¶ 65    Turning to the allegations of defendant's postconviction petition, the circuit court noted that defendant sought to "re-litigate numerous claims from his initial post-conviction petition" and that such action was clearly barred by the Post-Conviction Hearing Act. The court clarified that it had previously found that these claims were frivolous and patently without merit or waived for failure to raise them on direct appeal. The court further explained that claims which were not waived were again denied on direct appeal after postconviction appellate counsel previously filed an exhaustive *Finley* memorandum setting forth the reasons why those claims were without merit.

¶ 66    The circuit court also found that defendant failed to show cause and prejudice for the claims raised in his motion for leave to file a successive postconviction petition, and leave to file

was denied. The circuit court also rejected defendant's challenges the constitutionality of his 25-year sentencing enhancement, noting that defendant's claims failed as a matter of law. Lastly, the circuit court found defendant's filings to be frivolous in that they lacked an arguable basis in law or in fact, contained allegations without evidentiary support, and/or were presented to hinder or cause unnecessary delay. Accordingly, the trial court ordered that defendant pay filing fees and court costs in the amount of $340. Defendant filed a timely notice of appeal.

¶ 67    In this court, defendant *pro se* contends that the court erred in denying his motions for substitution of judge and for leave to file a successive postconviction petition. We first address defendant's claims regarding substitution of the trial judge.

¶ 68    Defendant argues that the circuit court erred in denying his motion for a substitution of judge because defendant "has shown that [the] trial judge is substantially prejudiced and was required to recuse himself from ruling on motions." Defendant asserts that the judge should not have ruled on his motions because he is "biased and prejudiced against [defendant] and had an interest in reaching a conclusion against him in his particular case." Defendant further claims that the circuit court was biased against him because the circuit court had "unwavering certainties in his rulings" and "prejudged" the "entire case," and there was "no hope of persuading him to the contrary if this cause were re-heard before him."

¶ 69    A judge is presumed to be impartial, and this presumption must be overcome by the party claiming that the judge is prejudiced. *People v. Steidl*, 177 Ill. 2d 239, 265 (1997). There is no absolute right to a substitution of judge at a postconviction proceeding. *People v. Hall*, 157 Ill. 2d 324, 331 (1993). Rather, the same judge who presided over defendant's trial should hear his postconviction petition, unless it is shown that defendant would be substantially prejudiced. *Id.* The fact that a judge has ruled adversely to a defendant in a criminal case does not disqualify that

judge from sitting in subsequent cases in which the same person is a party. *People v. Harvey*, 379 Ill. App. 3d 518, 522 (2008).

¶ 70     In order to obtain a different judge for postconviction proceedings, defendant must show that allowing the same judge to preside over the case would result in "substantial prejudice." *People v. Zirko*, 2021 IL App (1st) 162956, ¶ 28; *People v. Townsend*, 2020 IL App (1st) 171024, ¶ 49. Prejudice means " 'animosity, hostility, ill will, or distrust towards [the] defendant.' " *Townsend*, 2020 IL App (1st) 171024, ¶ 49 (quoting *People v. Patterson*, 192 Ill. 2d 93, 131 (2000)). We review a trial court's ruling on a motion for substitution of judge under the manifest weight of the evidence standard. *People v. Mercado*, 244 Ill. App. 3d 1040, 1047 (1993). A decision is against the manifest weight of the evidence where it is clearly erroneous, or where the record reflects the opposite conclusion. *Id.*

¶ 71     We find nothing in the record to support defendant's claim that the circuit court was prejudiced against him. Defendant's claim is based primarily on the court's finding that Webster's videorecorded statement to police the night of the shooting was more credible than her recantation at trial. Defendant disagrees with the court's credibility conclusion, and contends that the trial court "abandon[ed] its role as a neutral and impartial arbiter of fact and assum[ed] the role of prosecutor" by making "conjecture inferences that Webster had a biased interest and motive to testify falsely at trial." However, it is the function of the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *People v. Graham*, 392 Ill. App. 3d 1001, 1009 (2009).

¶ 72     As the trier of fact during defendant's criminal trial, the judge made rulings based on the credibility of the witnesses. In her trial testimony, Webster testified that the victim and defendant

were fighting over the firearm when it was discharged. This testimony was contrary to her videorecorded statement, in which she stated that defendant held the firearm to the victim's head and fired. Webster also testified that she visited defendant in pre-trial detention between ten and twenty times, and had given birth to defendant's child in the time since the shooting. In assessing the evidence and finding that the State had proved defendant's guilt beyond a reasonable doubt, the circuit court found that the "statement that Ms. Webster made the day of this offense was far more credible than" her trial testimony. The record reflects that the circuit court properly considered not only Webster's bias, but the substance of her trial testimony, the substance of her videorecorded statement, and all the other evidence elicited at trial.

¶ 73     This court has reviewed Webster's videotaped statement as part of this appeal, and we see no basis from which to second guess the trial court's credibility assessment. See *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 55 (A reviewing court will not "substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses."). Although defendant contends that Webster was intoxicated at the time of her videotaped statement, based on our independent review, we agree with the trial court that there was no evidence showing that Webster was intoxicated at that time. Webster answered all questions directed to her, and her demeanor was generally calm and coherent, although she became visibly upset at times when detailing the shooting. When specifically asked whether she was under the influence of any alcohol or drugs, Webster responded that she was not.

¶ 74     Defendant also takes issue with one particular comment made during the trial court's ruling. In explaining its assessment of the credibility of Webster's trial testimony, the court stated: "By her own admission, she had visited [defendant] numerous times in Cook County Jail, and so I guess some phrase that was used by a judge many, many years ago, she decided to rally

around the living, so to speak." Defendant contends that by referring to another judge's comments in a different case, the court was relying on "private knowledge" and "information outside the record." A reasonable reading of the court's comments makes clear that the trial court was merely discussing the evidence and expressing its own analysis of Webster's credibility based on the court's knowledge and experience, as the trier of fact is entitled to do. *Thomas*, 377 Ill. App. 3d at 963 ("A trial judge does not operate in a bubble; she may take into account her own life and experience in ruling on the evidence."). The court's isolated comment referring to a statement by another judge does not demonstrate that the court considered improper evidence.

¶ 75    Finally, defendant argues that the circuit court "has also been engaging in an ongoing pattern of deliberately and intentionally (1) failing to give any due independent consideration to each and every claim raised by [defendant]; (2) mischaracterizing, improperly assessing, and contradicting claims as a basis to reject them; (3) using inapplicable precedent case law authorities as a basis to reject claims; and (4) failing to acknowledge, consider, follow, and apply relevant and applicable precedent case law authorities, constitutional law, and Illinois law that [defendant] cite[s] to base and support claims." Defendant offers no support for these contentions, other than the fact that the court has ruled against him. "The entry of an adverse judgment, standing alone, is not evidence of prejudice." *People v. Hall*, 157 Ill. 2d 324, 335 (1993). Based on our review of the appellate record, we find nothing to support a claim that the trial judge continuing to preside over defendant's case would result in "substantial prejudice" to defendant. We accordingly affirm the denial of defendant's motion for substitution of judge.

¶ 76    Defendant next asserts that the circuit court erred when it denied his motion for leave to file his successive postconviction petition. Initially, we note that defendant has focused his appellate argument on the following five specific claims: (1) his trial counsel provided

ineffective assistance by failing to introduce Webster's prior inconsistent statements; (2) defendant's due process rights to a fair trial were violated by the introduction of Webster's videorecorded statement, and appellate counsel was ineffective for failing to raise the issue on direct appeal; (3) defendant's due process rights to a fair trial were violated because the trial judge was biased against him; (4) defendant's due process rights to a fair trial were violated because his "indictment was based on unsworn, misleading, [and] deceptive testimony"; and (5) the firearm sentencing enhancement is unconstitutional. Defendant has provided no argument regarding the other several claims contained in his successive postconviction petition, and accordingly, he has abandoned those arguments, forfeiting them for review. *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 9; Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *People v. Guest*, 166 Ill.2d 381, 414 (1995).

¶ 77    The Illinois Post-Conviction Hearing Act (Act) provides a mechanism for convicted defendants to assert that their constitutional rights were substantially violated during their original trial or sentencing hearings. *People v. Dorsey*, 2021 IL 123010, ¶ 31; 725 ILCS 5/122-1(a). Postconviction proceedings are confined to constitutional matters that have not and could not have been previously adjudicated. *People v. Blair*, 215 Ill. 2d 427, 447 (2005).

¶ 78    Because an action seeking postconviction relief is a collateral proceeding, not an appeal from the underlying judgment, the Act contemplates the filing of one postconviction petition. *People v. Edwards,* 2012 IL 111711, ¶ 22. "Consequently, all issues actually decided on direct appeal or in the original postconviction petition are barred by the doctrine of *res judicata,* and all issues that could have been raised in the original proceeding, or original postconviction petition, but were not, are waived." *People v. Anderson*, 375 Ill. App. 3d 990, 1000 (2007).

¶ 79    Claims not raised in an initial petition are waived unless the defendant can show cause for, and prejudice from, failing to raise the claim in the earlier petition, or makes a colorable claim of actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42. Where, like here, a defendant does not raise a claim of actual innocence, the defendant must establish both cause and prejudice in order to prevail on a motion for leave to file a successive postconviction petition. *People v. Pitsonbarger*, 205 Ill. 2d 444, 464 (2002).

¶ 80    The cause-and-prejudice standard a defendant must meet to obtain leave to file a successive petition involves a higher standard than the frivolous and patently without merit, or "gist," standard that an initial petition must meet to survive summary dismissal under section 122-2.1(a)(2) of the Act. *Edwards*, 2012 IL 111711, ¶¶ 26-27. The Act defines "cause" as "an objective factor that impeded [the defendant's] ability to raise a specific claim during his or her initial postconviction proceedings." 725 ILCS 5/122-1(f) (West 2016). To establish "prejudice," a defendant must demonstrate that the claim not raised in an initial postconviction proceeding "so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 81    When faced with a motion for leave to file a successive postconviction petition, the court conducts "a preliminary screening" to determine whether the motion adequately alleges facts to make a *prima facie* showing of cause and prejudice. *People v. Bailey*, 2017 IL 121450, ¶ 24. To meet the cause-and-prejudice test for a successive petition, a defendant must "submit enough in the way of documentation to allow a circuit court to make that determination." *People v. Tidwell*, 236 Ill. 2d 150, 161 (2010). "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentations submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further

proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. Courts review the denial of a motion for leave to file a successive petition *de novo*. *Dorsey*, 2021 IL 123010, ¶ 32.

¶ 82    Defendant does not identify any objective factor that impeded his ability to raise any specific claim during his initial postconviction proceedings to establish cause for his failure to raise the issues earlier. In fact, defendant did raise the same claims in his initial petition. Defendant contends, however, that he should be allowed to "re-raise" the issues that were contained in his initial petition, because postconviction appellate counsel rendered "ineffective assistance" by failing to raise the claims on appeal and, instead, filing a *Finley* motion. We note, however, that on appeal from defendant's initial postconviction petition, this court already considered the issues defendant raised. We carefully reviewed the record, counsel's *Finley* memorandum, and defendant's response, and agreed with counsel's conclusion that there were no issues of arguable merit to be raised in an appeal. *People v. Adams*, No. 1-16-1407 (April 12, 2018) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 83    Defendant acknowledges that his issues were previously raised in his initial petition for postconviction relief. He contends, however, that this court should treat his successive petition as an initial petition, because the proceedings on his initial petition were "void" where the trial judge did not recuse himself from ruling on the petition, which, defendant asserts, contained "meritorious claims of bias and prejudice" against the judge. As we have previously found nothing in the record that could support defendant's claim that the trial judge was prejudiced against him, we similarly reject defendant's claim that the trial judge's continued participation "void[ed]" the subsequent proceedings.

¶ 84    Defendant additionally argues that he is not barred from re-raising the same issues because he has not received a decision on the merits of his issues, and that he need not establish

"cause" for not raising an issue in his direct appeal because he "did not exhaust his direct appeal." However, as stated above, postconviction proceedings allow inquiry into constitutional issues that were not, *and could not have been*, adjudicated on direct appeal or in a prior postconviction proceeding. *People v. Anderson*, 375 Ill. App. 3d 990, 1000 (2007). Whether defendant proceeded in his direct appeal is not the relevant question. Instead, issues that were raised and decided on direct appeal or in a previous postconviction proceeding are barred by the doctrine of *res judicata*, and issues that could have been raised, but were not, are waived. *Towns,* 182 Ill.2d at 502–03.

¶ 85    In these circumstances, we conclude that defendant's claims in this appeal are barred by r*es judicata* and waiver. Where *res judicata* and waiver preclude defendant from obtaining relief, such a claim will necessarily be frivolous and patently without merit (*Blair*, 215 Ill.2d at 445), and leave of court to file a successive postconviction petition should be denied (*Smith*, 2014 IL 115946, ¶ 35).

¶ 86    Forfeiture aside, this court would also affirm the denial of leave to file a successive postconviction petition, as the issues defendant raises lack merit.

¶ 87    Specifically, defendant raises a claim of ineffective assistance based on trial counsel's failure to introduce prior consistent statements that Webster allegedly gave to defense counsel's investigator prior to trial. Defendant claims that the prior consistent statements of Webster would have corroborated Webster's later testimony that the shooting occurred during a "struggle" over the gun.

¶ 88    To demonstrate "prejudice," defendant was required to show the contents of Webster's statements and how they would have changed the results of the trial. Defendant, however, failed to provide the contents of Webster's alleged statements or any documentation attesting that the

statements actually occurred. Defendant contends that he was not required to state the contents of Webster's statements, but offers no support for this contention except to argue that he needed only present a "limited amount of detail."

¶ 89    Initially, we note that the requirement that a *pro se* petitioner present a "limited amount of detail" applies to first-stage initial postconviction petitions, and "our court has made pellucidly clear [that] the pleading requirements for successive postconviction petitions are higher than the pleading requirements for initial postconviction petitions." *People v. Horshaw*, 2021 IL App (1st) 182047, ¶ 134, citing *Smith*, 2014 IL 115946, ¶ 35; *People v. Robinson*, 2020 IL 123849, ¶ 43. Nonetheless, even under the more lenient standard applied to initial petitions, our supreme court has explained,

> "a limited amount of detail does not mean that a *pro se* petitioner is excused from providing any factual detail at all surrounding the alleged constitutional deprivation. Such a position would contravene the language of the Act that requires some factual documentation which supports the allegations to be attached to the petition or the absence of such documentation to be explained. This court has held that the purpose of section 122–2 is to establish that a petition's allegations are capable of objective or independent corroboration. We have also held that the affidavits and exhibits which accompany a petition must identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations. Thus, while a *pro se* petition is not expected to set forth a complete and detailed factual recitation, it must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent. As a result, the failure to either

attach the necessary affidavits, records, or other evidence or explain their absence is fatal to a post-conviction petition and by itself justifies the petition's summary dismissal." *People v. Delton*, 227 Ill. 2d 247, 254 (2008) (internal quotation marks and citations omitted).

¶ 90 Here, defendant conclusively claims that Webster made statements that were consistent with her trial testimony, but he provided no factual allegations from which one could determine the contents of her statements. Without knowing the contents of Webster's alleged statements, defendant cannot show that they were consistent with her trial testimony, that they would have been admissible at trial, or that they would have changed the outcome of his trial.

¶ 91 Moreover, even assuming that Webster gave prior consistent statements to the defense investigator months after the shooting, defendant cannot show ineffective assistance from trial counsel's failure to introduce evidence of such statements. Ineffective assistance of counsel claims are judged by the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Albanese*, 104 Ill. 2d 504 (1984). "*Strickland* requires that defendant prove (1) that counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) that the deficient performance prejudiced the defense such that defendant was deprived a fair trial whose result was reliable." (Internal quotation marks and citation omitted) *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991).

¶ 92 Judicial scrutiny of counsel's performance is highly deferential and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Regarding the second prong, "the defendant must demonstrate that there is a

reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *People v. Shatner*, 174 Ill. 2d 133, 144 (1996). The failure to satisfy either prong of *Strickland* precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697. When analyzing the two-part *Strickland* test, a court may dispose of an ineffectiveness claim for lack of sufficient prejudice before reaching the deficiency analysis. *Id.* at 13.

¶ 93    Even assuming that Webster gave prior consistent statements to the defense investigator, there is no reasonable probability that the result of defendant's trial would have been different had those statements been introduced. The circuit court clearly expressed that it found Webster's statements immediately after the shooting more credible, and a subsequent recantation of her videorecorded statement still would suffer from the same issues of credibility, whether that recantation was initially made at trial or to a defense investigator. Accordingly, defendant cannot establish prejudice from trial counsel's failure to introduce Webster's alleged prior consistent statements.

¶ 94    Second, defendant argues that his due process rights to a fair trial were violated because Webster's videorecorded statement was "improperly admitted at trial as a prior inconsistent statement under 725 ILCS 5/115-10.1," and he blames his appellate counsel for failing to cite this issue on appeal. Section 5/115-10.1 of the Code of Criminal Procedure provides that

> "evidence of a statement made by a witness is not made inadmissible by the hearsay rule if
>
> (a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—

***

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

***

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

¶ 95    Defendant focuses on what he characterizes as "significant inconsistencies" in Webster's videorecorded statement, which he contends show that her statement was "false" and that she "did not narrate, describe, nor explain events of the shooting within her personal knowledge." Defendant therefore contends that the evidence against him was "insufficient to sustain" his conviction for attempted murder.

¶ 96    The two-part test for effective assistance of counsel announced in *Strickland* also applies to claims of ineffective assistance of appellate counsel. *People v. Caballero*, 126 Ill. 2d 248, 269-70. A successful claim of ineffective assistance of appellate counsel requires a showing that (1) the failure of appellate counsel to raise an issue was objectively unreasonable, and (2) there is a reasonable probability that, but-for appellate counsel's error, appellant's sentence or conviction would have been reversed. *Id.* It is not incompetent for appellate counsel to refrain from raising

issues that are without merit, unless counsel's appraisal was patently wrong. *People v. Barnard*, 104 Ill. 2d 218, 231 (1984).

¶ 97    Contrary to defendant's argument, the fact that defendant finds inconsistencies in Webster's account does not mean that she did not have personal knowledge of the shooting. Significantly, defendant does not contend that Webster was not present for the shooting; he merely contends that her account of the shooting at trial was more accurate than her earlier videorecorded account. Accordingly, we find no merit in defendant's contention that the videorecorded statement should not have been admitted as a prior inconsistent statement under 725 ILCS 5/115-10.1, and appellate counsel was not ineffective for failing to raise that issue.

¶ 98    Defendant next claims that his due process rights to a fair trial were violated because the trial judge was biased against him. As we have previously found no evidence of bias, we need not analyze this claim further.

¶ 99    Defendant further claims that his due process rights to a fair trial were violated because his "indictment was based on unsworn, misleading, [and] deceptive testimony." Defendant's argument on this point is exceedingly sparse. He does not expand on what testimony was unsworn, misleading or deceptive, and he cites no legal authority. Even if the argument was not barred by *res judicata* and waiver, as we found above, we would conclude that he has forfeited review of the issue in these circumstances. See *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88 ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research." (Internal quotations and citation omitted)); see also *In re A.H.*, 215 Ill. App. 3d 522, 529–30 (1991) (noting that *pro se* appellants are held to the same standards as attorneys on appeal).

¶ 100 Nonetheless, as best this court can understand, it appears that defendant is challenging the grand jury proceedings. As part of this appeal, defendant requested that this court allow him to supplement the record with minutes or transcripts from the grand jury proceedings. The motion was granted, and we ordered the Office of the State's Attorney to facilitate the release, certification, and supplementation of the record. Thereafter, transcripts of the grand jury proceedings were filed in the record on appeal. This court has reviewed those transcripts, which indicate that the testifying detective was duly sworn, and we find nothing to support defendant's conclusory claims that the testimony was misleading or deceptive.

¶ 101 Finally, defendant raises several challenges to the constitutionality of his 25-year firearm enhancement, and requests that this court "simply vacate" his 25-year sentence enhancement without remanding for resentencing. In addition to those challenges being barred by *res judicata* and waiver, as described above, defendant's constitutional challenges are legally meritless. Accordingly, defendant cannot establish the prejudice requirement for filing a successive postconviction petition.

¶ 102 A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity. *People v. Moss*, 206 Ill. 2d 503, 519-20 (2003), r*ev'd on other grounds, People v. Sharpe*, 216 Ill. 2d 481 (2005). Courts must construe a statute in a manner that upholds its validity and constitutionality if it reasonably can be done. *Moss*, 206 Ill. 2d at 520. The constitutionality of a statute is subject to *de novo* review. *Id.*

¶ 103 Defendant first contends that the firearm enhancement, "as applied" to him, violates "double jeopardy" and "due process" because it results in "multiple punishments for the same act," and accordingly, it is "not reasonably designed to remedy the particular evil that the legislation was intended to target." Defendant argues that "the discharge of a firearm against [the

victim] inflicting great bodily harm stand[s] alone as the alleged act of [defendant], and both his 10-year baseline sentence and his 25-year add-on were based on this sole act."

¶ 104   This argument has been rejected repeatedly by the supreme court and this court. See *Moss*, 206 Ill. 2d at 537 (the use of a firearm element did not constitute multiple punishment and, therefore, did not result in any double jeopardy violation); *People v. Sawczenko-Dub*, 345 Ill. App. 3d 522, 535 (2003) (mandatory firearm enhancement provisions do not violate proportionalities clause or prohibition against double jeopardy); *People v. Bloomingburg*, 346 Ill. App. 3d 308, 325 (2004) ("[B]ecause the firearm factor is not an inherent or essential element of [the offense] and it is only used to impose a longer sentence, there is no double enhancement.").

¶ 105 Defendant additionally argues that the firearm enhancement violates the "equal protection" clause, as applied to him, because there are "numerous individuals who were also convicted of committing attempted murder with a firearm but did not receive any of the firearm enhancements." Defendant cites 28 purported examples of cases in which the defendants were "convicted of committing attempted murder with a firearm" but did not receive a firearm enhancement to their sentences.

¶ 106   Defendant characterizes his argument as an "equal protection" challenge; however, he does not identify any classification created by the statute. The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner unless the government can demonstrate an appropriate reason to treat them differently. *People v. R.L.*, 158 Ill. 2d 432, 437-38 (1994). "For a court to engage in any manner of equal protection review of a statute, the challenging party must show that the statute classifies persons in some manner." *People v. Bennett*, 284 Ill. App. 3d 276, 280 (1996) (citing *People v. Wegielnik*, 152 Ill. 2d 418, 429 (1992)). Before we can reach the ultimate question of whether the complained of statute

violates the equal protection clause, we must first determine whether defendant is similarly situated to the comparison group. *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 68 (citing *People v. Whitfield,* 228 Ill. 2d 502, 513 (2007)). When a party fails to make this showing, his equal protection challenge must fail. *Id.*

¶ 107 Defendant's claim is merely that other individuals have experienced better outcomes than himself. However, defendant's equal protection interests have not been violated simply because other defendants who committed unrelated crimes may have received more lenient sentences. The supreme court has rejected such "cross-case comparative sentencing" as a basis for challenging a defendant's sentence. *People v. Fern*, 189 Ill. 2d 48, 55-62 (1999) ("[S]uch an analysis does not comport with our sentencing scheme's goal of individualized sentencing and would unduly interfere with the sentencing discretion vested in our trial courts."); see also *People v. Gutierrez*, 402 Ill. App. 3d 866, 901 (2010); see also *People v. Harris*, 2012 IL App (1st) 092251, ¶ 30, quoting *People v. Wade*, 131 Ill. 2d 370, 379 (1989) ("In point of fact, our supreme court has held that even where the statutes themselves provide different sentencing ranges for similar conduct, giving the prosecutor the power to elect upon which statute to prosecute the offense, 'the availability of different punishments for separate offenses based on the commission of the same acts does not offend the constitutional guarantees of equal protection or due process.'").

¶ 108 Defendant next asserts that the firearm enhancement is "facially unconstitutional" under the cruel and unusual punishment clause, because one who is charged with attempted murder is not permitted "to introduce mitigation evidence that he acted while possessing an unreasonable belief that his actions were necessary for his defense." According to defendant, this means that his punishment is "disproportionate" in violation of the eighth amendment because an offender

who "succeeds in killing his victim" does receive an opportunity to reduce his sentence by presenting this sort of mitigation evidence.

¶ 109 The Illinois Supreme Court in *People v. Lopez*, 166 Ill. 2d 441, 450-51 (1995), rejected this very same argument where it was raised under the Illinois constitution's proportionate penalties clause. Specifically, the *Lopez* court held: "We do not believe that the disparity in sentencing range here is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. Accordingly, we hold that under the Illinois attempt statute, no crime of attempted second degree murder exists." *Id.* Because the Illinois proportionate penalties clause is co-extensive with the eighth amendment's cruel and unusual punishment clause (*People v. Patterson*, 2014 IL 115102, ¶ 106), defendant's claim necessarily fails.

¶ 110 Defendant next claims that "the attempt statute and [his] 25-year firearm enhancement are facially unconstitutional *** under the Equal Protection Clause" because an offender who is convicted of attempted first-degree murder can have his sentence reduced to a Class 1 offense by presenting evidence that he acted under sudden and intense passion resulting from serious provocation, but not because he acted while possessing an unreasonable belief that his actions were necessary for his defense.

¶ 111 This argument was specifically rejected in *People v. Guyton*, 2014 IL App (1st) 110450, ¶¶ 53-69. The *Guyton* court explained that, as discussed above, the supreme court in *Lopez* found that attempted second degree murder did not exist. *Lopez*, 166 Ill. 2d at 450-51. Almost 15 years after *Lopez*, the legislature acted, but chose only to allow attempted first-degree murder to be mitigated by "serious provocation," and not "imperfect self-defense." See *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 45. As the court in *Guyton* observed, "The legislature could have

easily addressed the issue of whether imperfect self-defense would be a mitigating factor in an attempted murder situation by adding such language when it made the above amendment, but chose not to. *** [T]hus, its inaction suggests agreement with the judicial interpretation of *Lopez.*" *Id.*

¶ 112   Finally, defendant argues that "the attempt statute and [his] 25-year firearm enhancement are facially unconstitutional *** under the Due Process Clause" because the term "another person" is ambiguous and "causes ordinary people to believe that this provision only proscribes serious bodily harm or death to another person *other than the perpetrator and intended victim* by the use of a firearm." (Emphasis in original). This argument was specifically rejected in *Sharpe*, 216 Ill. 2d at 528-29, in which our supreme court determined that it was "quite clear that the legislature intended the enhanced penalty to apply whenever the perpetrator by means of personal discharge of a firearm causes the requisite level of injury to someone other than himself."

¶ 113   Accordingly, all of defendant's constitutional challenges to his 25-year sentence enhancement are legally meritless and leave to file a successive postconviction petition was properly denied. See *Smith*, 2014 IL 115946, ¶ 35.

¶ 114   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 115   Affirmed.